# EXHIBIT 1

Page 1

1                  UNITED STATES DISTRICT COURT

2                  NORTHERN DISTRICT OF CALIFORNIA

3                        OAKLAND DIVISION

4

5   JEFF YOUNG, individually and on  )
    behalf of all others similarly  )
6   situated,                        )
                                     )
7                  Plaintiff,        )
                                     ) Case No.
8            vs.                     ) 4:17-cv-06252-YGR
                                     ) Volume I
9   CREE, Inc.,                      )
                                     ) Pages 1 to 216
10                 Defendant.        )
    _____)

11

12

13

14

15

16

17       VIDEOTAPED DEPOSITION OF STEFAN BOEDEKER

18                  Los Angeles, California

19                  Tuesday, March 12, 2019

20

21

22

23

24  Reported by:
    ELIZABETH BORRELLI, CSR No. 7844, CCRR, CLR
25  JOB NO. 157285

Page 2

```
 1
 2
 3
 4
 5
 6
 7
 8        Videotaped Deposition of STEFAN BOEDEKER,
 9   Volume I, taken on behalf of the Defendant, at
10   2029 Century Park East, Suite 2600, Los
11   Angeles, California 90067-3012, commencing at
12   9:40 a.m., Tuesday, March 12, 2019, before
13   Elizabeth Borrelli, a Certified Shorthand
14   Reporter in the State of California, License
15   No. 7844.
16                        * * *
17
18
19
20
21
22
23
24
25
```

```
 1   APPEARANCES OF COUNSEL:

 2

 3   For the Plaintiff:

 4              AUDET & PARTNERS
                BY:  S. CLINTON WOODS, ESQ.
 5              711 Van Ness Avenue
                San Francisco, CA 94102
 6

 7

 8                   - AND -

 9

10              PEARSON SIMON & WARSHAW
                BY:  JOSEPH BOURNE, ESQ.
11              800 LaSalle Avenue
                Minneapolis, MN 55402
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1   For the Defendant Cree Inc.:

 2            KATTEN MUCHIN ROSENMAN
              BY:  REBECCA LINDAHL, ESQ.
 3            550 South Tryon Street
              Charlotte, NC 28202
 4

 5

 6                 - AND -

 7

 8            KATTEN MUCHIN ROSENMAN
              BY:  ANDREW DEMKO, ESQ.
 9            2029 Century Park East
              Los Angeles, CA 90067
10

11                 - AND -

12

13

              KATTEN MUCHIN ROSENMAN
14            BY:  CHARLES DeVORE, ESQ.
              525 West Monroe Street
15            Chicago, IL 60661

16

17

18      Also Present:

19            JULIAN ABALOS, Videographer

20            MELISSA GARRETT, Cree in-house counsel

21            JESS DAVID, Edgeworth Economics

22            RENE BEFURT, The Analysis Group

23

24

25
```

1                         I N D E X

2    WITNESS                              EXAMINATION

3    STEFAN BOEDEKER

4    By MS. LINDAHL                              8

5    By MR. WOODS                              211

6

7

8                         EXHIBITS

9

10   BOEDEKER                                 PAGE

11   Exhibit 1        Defendant Cree, Inc.'s Notice       7
                      of Deposition of Plaintiff's
12                    Expert Stefan Boedeker, 3 pages

13   Exhibit 2        CV of Stefan Boedeker, 18 pages     11

14   Exhibit 3        Document titled "Expert Report      30
                      of Stefan Boedeker in Support
15                    of Plaintiff's Motion for Class
                      Certification," 84 pages
16
     Exhibit 4        Engagement letter from Levin        31
17                    Sedrin & Berman to Berkeley
                      Research Group, 5 pages
18
     Exhibit 5        January 15, 2019 invoice from       35
19                    Berkeley Research Group, 3
                      pages
20
     Exhibit 6        Document titled "List of            45
21                    Documents Considered," 5 pages

22   Exhibit 7        Amended Class Action Complaint,     54
                      27 pages
23
     Exhibit 8        Spreadsheet of lightbulb            55
24                    pricing and information, 2
                      pages

25

 1    Exhibit 9        Order re: Motion to Dismiss, 18        74
                       pages
 2
      Exhibit 10       Document titled "Light Bulbs           102
 3                     Survey," 9 pages

 4    Exhibit 11       E-mail string among various            121
                       individuals, 3 pages
 5
      Exhibit 12       February 19, 2019 invoice from         125
 6                     Berkeley Research Group, 4
                       pages
 7
      Exhibit 13       E-mail string among various            132
 8                     individuals, plus attachments

 9    Exhibit 14       Screenshots of survey, 42 pages        140

10    Exhibit 15       Document titled "Light Bulbs           143
                       Survey," 13 pages
11

12

13                       INFORMATION REQUESTED

14                            (None)

15                       UNANSWERED QUESTIONS

16                            (None)

17

18

19

20

21

22

23

24

25

1    -- you probably have the number in front of you.  I

2    don't --

3         Q.   31?

4         A.   Yeah, 31, the Dial case, yes.

5         Q.   Okay.  And so was your testimony accepted

6    by the Court as admissible in both of those matters?

7         A.   Yes.

8         Q.   Okay.  Can you look with me, please, at

9    the -- at page 1?  You list -- on the left-hand

10   side, you have a column where you list your

11   education and professional associations.

12        A.   Yeah.

13        Q.   Do you see that?

14        A.   That's correct.

15        Q.   Is the column that describes your

16   education, you have five bullet points there, is

17   that accurate and complete?

18        A.   Yes, like three degrees in Germany, then

19   in United States, yeah, this is correct pretty much.

20        Q.   In addition to the education that you list

21   in the column with the heading "Education," do you

22   have any specific training in conjoint analysis?

23        A.   I mean, no -- no specific training as in

24   academic classes or anything, so...

25        Q.   How did you learn how to perform conjoint

1            And the question arose, yeah, how do we

2    price these products?  And that's where I first

3    applied conjoint.

4    BY MS. LINDAHL:

5        Q.   Have you taken or participated in any

6    continuing education classes related to conjoint

7    analysis?

8        A.   No, I have not taken any additional

9    classes outside the academic area.

10       Q.   So you were -- you also list under the

11   heading "Professional Associations," you have seven

12   bullet points there.

13           Are those bullet points complete and

14   accurate?

15       A.   I mean, they -- they should be -- I mean,

16   these are the -- what I put down as relevant

17   professional associations and they -- they should be

18   accurate.

19       Q.   Okay.

20       A.   Just looking at the -- yeah, the Insights

21   Association was the old Marketing Research

22   Association so that's a -- a new name, but they

23   should be.

24       Q.   And you -- you've been at your current --

25   your current employer is Berkeley Research Group,

1   correct?

2       A.   Yes.  I'm -- I'm like a shareholder there.

3       Q.   And you've been there since 2010?

4       A.   Yeah.  I was one of the -- the first

5   joining the company.  It was founded in March 2010.

6       Q.   Okay.  I am going to hand you a document

7   that we're going to mark as Exhibit 3.

8            (Whereupon Exhibit 3 was marked for

9            identification.)

10  BY MS. LINDAHL:

11      Q.   Have you had an opportunity to review the

12  document that was marked as Exhibit 3?

13      A.   I -- I flipped through.  I was looking for

14  the signature page, and so -- and then the cover

15  page so it seems to be a copy of my -- my report

16  that I issued here in January.  It's a signed

17  version.  And I didn't flip through every single

18  page, but it appears --

19      Q.   But it appears --

20      A.   It appears to be the -- the complete

21  report.

22      Q.   Okay.  And you were retained by the

23  plaintiff in this matter to give expert testimony

24  related to damages; is that correct?

25      A.   Yeah, it was my understanding the

1    retention was -- was not so much to -- to give

2    testimony about specific damages.  I was asked in

3    the class certification process to develop a --

4    introduce, develop, explain a methodology that could

5    calculate damages and then perform an empirical

6    study where I showed how that actually works

7    concretely rather than just saying it can be done.

8    So this is now my -- my report to this case -- or up

9    to this point in this case.  It contains all of

10   these three aspects, right?  I'm -- I'm talking

11   about the economics behind the damages model.  I'm

12   explaining, introducing statistical techniques that

13   enable the estimation of damages, and then I -- I

14   used an actual conjoint study to show how it's

15   actually concretely calculated.

16        Q.   Okay.

17             THE REPORTER:  Can we go off for a minute,

18   please?

19             MS. LINDAHL:  Yes, ma'am.

20             THE VIDEOGRAPHER:  Going off the record at

21   10:10 a.m.

22             (Recess.)

23             (Whereupon Exhibit 4 was marked for

24             identification.)

25             THE VIDEOGRAPHER:  Back on the record at

1      Q.   Okay.  So looking back at Exhibit 6, the

2   list of documents considered, do you believe that

3   list of documents considered to be complete and

4   accurate?

5      A.   I mean, right now, without going through

6   every single line item, I mean, this is -- I mean,

7   it's all the calculations themselves.  There is the

8   admin file and then there's a lot of articles,

9   references to statistics and econometrics books, and

10  then there is pleadings and other documents.  I

11  mean, right now as I'm sitting here, I would

12  probably say yes, it is -- it is probably -- plus

13  what is in the footnotes are not included here, that

14  should be all that I considered for this report.

15     Q.   Okay.  What is your understanding of the

16  allegations that the plaintiff is making against

17  Cree on behalf of the potential class?

18     A.   In very simple terms is that the product

19  was marketed as what I will call under the general

20  umbrella of having the longevity property

21  characteristic when, in fact, it doesn't.

22     Q.   How did you obtain that understanding of

23  the allegations that the plaintiff is making against

24  Cree on behalf of the class?

25     A.   That was through reading the complaint but

1   is, and I don't know if it's a printing issue.  The

2   electronic copy should show it, so maybe the column

3   was not formatted with the full width and it cut it

4   out.

5        Q.   And did you previously testify that in

6   connection with some of the internet research that

7   either you our team did to determine the price of

8   the lightbulbs that you also viewed some packaging?

9        A.   Yeah.  I mean, a lot of these things on

10  the website did have images of the products, so --

11  but, again, that was -- I was maybe standing next to

12  the terminal where one of the staff was doing the

13  work and I looked at some of that, but nothing that

14  I would have printed out or put in my report.

15       Q.   Okay.  Or taken any notes on?

16       A.   No, I did not take any notes on that.

17       Q.   Did you personally do any industry

18  research in connection with preparing your expert

19  report in this matter?

20            MR. WOODS:  Object to form.

21            You can answer.

22            THE WITNESS:  I did not do personally any

23  industry research for this report.

24  BY MS. LINDAHL:

25       Q.   Did you receive, either from your team or

Page 64

1   of years or hours, and it's the comparison and the

2   long-term warranty.  Those are three claims that

3   best reflected the longevity.

4       Q.   Part of your definition of "longevity

5   claims" includes a representation, as stated by you,

6   that "Defendant's LED bulbs will last up to three

7   times as long as the cheap LED bulbs."

8            Do you see that?

9       A.   Yes.

10      Q.   What is a cheap LED bulb?

11           MR. WOODS:  Objection.  Beyond the scope.

12  Beyond the scope.

13           You can answer.

14           MS. LINDAHL:  They're his words.

15           THE WITNESS:  Yeah, I'm just looking at

16  it.  There's some quotation marks or that is

17  something that -- it says, "up to three times as

18  long," and unfortunately, there's no footnote, but

19  that's not something I made up, so it's something

20  that I probably -- either it's in the motion or in

21  the -- in the -- in the complaint itself.

22  BY MS. LINDAHL:

23      Q.   The phrase "cheap LED bulbs" is included

24  in one of the attributes that you included in your

25  conjoint study, correct?

1       A.    I do remember that I had it six times.   I

2    have to see if I use the same terminology there, but

3    it could -- it's possible.

4       Q.    Okay.

5       A.    I mean, right now, I would have to look at

6    the exact wording of that attribute.

7       Q.    Okay.  But sitting here today, can you

8    tell me what "cheap LED bulbs" means in the context

9    of your conjoint study?

10      A.    In the context of the conjoint study, it

11   is a terminations that refers to a lower price

12   without quantifying the lower price.  And if my --

13   my thinking is right, that since this is in

14   quotation marks, I just don't know where exactly

15   this phrase is coming from, then it's something when

16   a consumer sees that, it's up to the consumer to

17   decide.  So it basically mirrors, more or less, a

18   purchase decision whether some unspecified --

19   quantitatively unspecified information but the

20   consumer reacts to it, right?  I mean, if

21   somebody -- for somebody who has a low budget, $4

22   may be expensive and $1 is cheap.  For somebody who

23   pays $15, anything under $5 may be cheap.  So

24   that -- that's not really a specified definition

25   that I'm using here.

1     Q.   Okay.  Are you -- as part of your

2  preparation of this report, did you do any research

3  or review any information related to the specific

4  types of testing that consumer LED bulbs must pass

5  to become Energy Star qualified?

6     A.   I did not review any -- any quality

7  control or other tests about the premarket launch of

8  LED lightbulbs.  I did not do that.

9     Q.   Do you know or did you review in

10  connection with preparing your -- your report, have

11  you seen any packaging of an LED bulb, Cree or

12  otherwise, that uses the phrase "cheap LED bulbs"?

13     A.   Right now, I don't recall.  I mean, I've

14  looked at a few on -- on the website and I have the

15  -- the images here, but I don't recall that I

16  actually read the "cheap LED lightbulbs" in there on

17  those specific examples.

18     Q.   Okay.  Are you able to -- if you look at

19  pages 4 and 5 of your report, are the photographs of

20  that packaging large enough such that you can read

21  all of the writing on them?

22     A.   I brought my reading glasses.

23     Q.   Good.

24     A.   So it's very small, so I would be taking

25  them out just in case.  Font size .7 is really

1    outside my range right now.

2        Q.   Are you able -- so you're -- so you're not

3    able to read these packages?

4        A.   I mean, right now if I put on my reading

5    glasses, and dependent to what level you're --

6    you're going down here, I may be able to read it.  I

7    may not be able to read it on the packaging

8    photography.

9        Q.   Were you ever provided larger images of

10   these packages that were sufficiently large that you

11   could read the representations on the package?

12       A.   I -- I think these are the -- the images.

13   I mean, the original size was probably the one in

14   the -- in the complaint.  On the website, you can

15   zoom in, right, so that's -- electronic version an

16   always better than scanned-in photography.  But I

17   never read the entirety of -- of the packaging

18   itself because my -- my -- my task was not to --

19   what do you call it -- like ad psychology.  There's

20   marketing psychologist that do ad perception, kind

21   of like surveys and studies.  That's not my

22   expertise.  I'm -- I'm kind of like data.  I'm

23   phrasing attributes and levels of attributes, and

24   then I'm measuring consumer response to a change in

25   those attributes.  So reading every single word on

1    -- on these packages was not necessary for the --

2    the work that I was retained for.

3        Q.   Do you know which representations on the

4    packaging including -- included in your expert

5    report the plaintiff's alleged to be false?

6            MR. WOODS:  Object to form.

7            THE WITNESS:  Again, it was my

8    understanding that the complaint was broad enough

9    in -- in the longevity attributes, which I then

10   summarized in whatever paragraph we just looked at

11   on -- I forgot the page, but where I'm basically

12   saying collectively, I will from now on call these

13   claims longevity claims.  And it is my understanding

14   that the summary of these claims that I

15   collectively, then, call longevity claims adequately

16   reflect what's alleged in the complaint without

17   tying it back to a particular plaintiff's or a

18   particular class representative's experience.

19   BY MS. LINDAHL:

20       Q.   Are you able to look at the images --

21   sitting here today, regardless of what your

22   assignment was, can you point to any specific

23   representation on the images set forth in your

24   expert report that the plaintiff's alleged to be

25   false?

1      A.   I'll give you an example.  Do you want me

2   to look at page 4, for example or --

3      Q.   Sure.  Any of the images that are included

4   in your report that are on page 4 and 5.

5      A.   I'll have to put my glasses here.

6           I mean, there's a warranty on page 4 at

7   the -- the lower corner, not the lower corner, like

8   in the middle on the right column, there is lifetime

9   savings that obviously imply that this lasts longer

10  than comparable.  So those would be two examples of

11  what I summarize collectively as longevity claims.

12     Q.   Okay.  Your definition of "longevity

13  claims," is that based on the plaintiff's allegation

14  in the complaint or is it based on actual packaging

15  that you reviewed?

16          MR. WOODS:  Asked and answered.

17          You can answer.

18          THE WITNESS:  Yeah, it's -- it's based on

19  allegations in the complaint, which is -- I mean,

20  typically where -- where, as an expert, I -- I get

21  some of my information.  So I'm testing is there a

22  consumer response if I change the attributes, right,

23  that were alleged in the complaint.  So that's kind

24  of what -- what my task was.  And, as I said, I'm

25  not an ad perception psychologist so the other

1  aspects were not relevant to -- to what I was doing.

2            Is this a good point?  I need to go to the

3  restroom.

4            MS. LINDAHL:  Oh, sure.  Absolutely.

5            THE VIDEOGRAPHER:  Okay.  Going off the

6  record at 11:04 a.m.  This is the end of Media

7  No. 1.

8            (Recess.)

9            THE VIDEOGRAPHER:  Back on the record at

10  11:14 a.m. starting Media No. 2.

11  BY MS. LINDAHL:

12      Q.  Let's look back, please, at paragraph 9 of

13  your expert report on page 3.

14      A.  Okay.

15      Q.  And included in your definition of

16  "longevity claims" is the satisfaction guarantee.

17            You described the satisfaction guarantee

18  warranty claims, correct?

19      A.  Yeah, that was one of the specific ones

20  that I tested.

21      Q.  Can you describe what you mean by the

22  phrase "the satisfaction guarantee warranty claims"?

23      A.  The satisfaction guarantee, it -- when --

24  that's the length of time that was specified with

25  that.  To me, it's also an indication of longevity

1    of the product.

2         Q.    Do you know specifically what length of

3    time the plaintiffs allege that the bulbs should

4    have lasted related to that satisfaction guarantee

5    warranty that you describe?

6         A.    I -- I don't know and I don't need that

7    for my study because I'm contrasting a product that

8    has that claim versus doesn't have that claim, and

9    that's what I'm calculating.  So the specific

10   experience of -- of a class representative or a

11   named plaintiff does not flow into my analysis.

12        Q.    In connection with preparing your report,

13   did you review Cree's warranty on its consumer LED

14   bulbs?

15        A.    I did not review any specific documents

16   regarding warranty.  As I said, I tested a product

17   that has that warranty versus one that doesn't have

18   it and saw or tried to quantify if there's a

19   difference in the price.

20        Q.    Do you have an understanding of who

21   comprises the class that the plaintiff is seeking to

22   represent in this matter?

23        A.    It is my understanding that it's a very

24   broad class of consumers who -- who bought the

25   products and overpaid because they -- they didn't

Page 72

1    have the -- the longevity that the consumers thought

2    they would get when they bought the lightbulb.  But

3    it's very specific.  I know there's a

4    California-specific component to it, but it's very

5    broad in terms of the products that are included.

6         Q.   Do you know the time period during which

7    the purported class members purchased Cree bulbs?

8         A.   Not off the top of my head, but it's

9    somewhere in my report.

10        Q.   Okay.  Can -- do you want to take a minute

11   and look for it?

12        A.   If I can find it, yes.

13        Q.   Sure.

14        A.   As far as something I read in the

15   complaint or the motion, because I just flipped

16   through the pages in the report where it -- I would

17   expect it to have cited it, but it's not in there.

18        Q.   As part of your -- as part of preparing

19   your report in this matter, did you do any research

20   into the time period during which Cree has sold the

21   consumer LED bulbs?

22        A.   I didn't do any independent research.  All

23   I -- I had looked at was what's in the complaint.

24        Q.   Do you know whether Cree has ever changed

25   its warranty during the time period that it has sold

1   consumer LED bulbs?

2       A.   I don't know about that, and I didn't look

3   into it.

4       Q.   And I believe you testified that you

5   didn't review Cree's warranty.

6            Did you review the warranties of any LED

7   -- consumer LED bulb manufacturers?

8       A.   No.

9       Q.   Do you have an understanding of what an

10  industry standard warranty on a consumer LED bulb is

11  today?

12      A.   I do not.

13      Q.   Do you have an understanding -- excuse me

14  -- of what a standard warranty on a consumer LED

15  bulb has been since -- between 2014 and today?

16           MR. WOODS:  Object to form.  Also, beyond

17  the scope.

18           You can answer.

19           THE WITNESS:  Again, that never was the

20  scope of my analysis and I've not looked into that

21  particular -- or to research that particular topic.

22  BY MS. LINDAHL:

23      Q.   Does the phrase "standard warranty" have

24  any meaning to you in the context of a consumer LED

25  bulb?

1          MR. WOODS:  Same objections.  You can

2     answer.

3          THE WITNESS:  Can you repeat?  What a

4     standard...

5          MS. LINDAHL:  Sure.

6          THE WITNESS:  Standard warranty?

7          MS. LINDAHL:  Standard warranty.

8          THE WITNESS:  Oh, yeah.  I just didn't

9     hear the first word, yeah.

10    BY MS. LINDAHL:

11         Q.   Do you have an understanding of what that

12    phrase means in the context of a consumer LED bulb?

13         A.   No.

14         MR. WOODS:  Same objections.

15         THE WITNESS:  I don't.

16         MR. WOODS:  You can answer.

17    BY MS. LINDAHL:

18         Q.   One of the documents -- actually, let me

19    make -- let you do the work here.

20         MS. LINDAHL:  What number are we on?

21         MR. WOODS:  Is this 9?

22         THE REPORTER:  This is 9.

23         MS. LINDAHL:  Thank you.

24         (Whereupon Exhibit 9 was marked for

25         identification.)

1   whatever the legal implications of that is, I didn't

2   worry about that, but I know that it's a motion and

3   certain aspects of that motion were denied.  Other

4   ones were granted.

5        Q.   Did the contents of this order that's been

6   marked as Exhibit 9 inform your expert opinions in

7   any way?

8        A.   It does not inform -- that's kind of,

9   like, an unusual word that I don't really use in the

10  context of my expert opinions.  You can --

11       Q.   How about affect?

12       A.   Affect?

13       Q.   How about affect?

14       A.   No.  This was -- the -- Counsel had told

15  me that there's additional information in this

16  motion that is not in the complaint, so I just read

17  it for -- for factual background.  And in my report,

18  I feel like there's four or five paragraphs where

19  I'm, like, paraphrasing it.  It always starts with

20  like, "It is my understanding that."  So that's kind

21  of what this was use for.  This was not used to --

22  to form any opinions or -- or affect any of my

23  opinions.  Because when I read this document, I

24  hadn't formed my opinions because I hadn't done the

25  analysis.

1      Q.   Are there any facts contained in this

2  document that affected your opinion in any way?

3      A.   No.  And actually, coincidentally, I'm

4  opening page 10 and on line 7, that's where "up to

5  the three times as long as cheap light" --

6  "lightbulbs" is coming from.  And earlier I said it

7  was not in my report.  There was no reference, but

8  here, I found the reference, page 10, line 7, so

9  this is where I took that from.

10          So besides this, getting little facts for

11  my "It is my understanding section" of my report,

12  this document didn't have any impact on the report

13  itself.

14      Q.   Okay.  So -- and you're referring on page

15  10 to the paragraph that -- that begins at line 5?

16      A.   Let's see.  I lost -- here it is.

17          Yes, "Here, plaintiffs challenge," and

18  then in line 7, there's that exact quote, and I

19  think it's associated -- or attributed to the

20  website.

21      Q.   Okay.  And it's not attributed to the

22  packaging, correct?

23      A.   From what I'm reading here, that's all I

24  know right now.

25      Q.   And your -- your conjoint analysis relates

1    to the packaging and not the website, correct?

2         A.    The conjoint analysis refers to product

3    attributes that the -- the consumer reacts to.  And

4    I don't know whether I differentiated between

5    website and -- and packaging, right?  I basically

6    introduced -- in the conjoint I introduced products

7    with different attributes, changed the attributes,

8    and had the -- the consumers, in this case, the

9    participants, who are consumers who were in the

10   market to buy the product make choices relative to

11   price and product combinations.  So it's really --

12   it's not a study in what people perceive on a -- on

13   a label or a package or on the website.  It's really

14   about showing a consumer attributes and then have

15   them trade off relative to the price, which, then,

16   is a reflection of their preferences.

17        Q.    Have you ever seen a representation on

18   Cree's website that compares its LED bulbs to cheap

19   LED bulbs?

20        A.    I -- I have not.

21        Q.    Have you seen a representation on the

22   website of any consumer LED bulb manufacturer that

23   compares that manufacturer's bulbs to cheap LED

24   bulbs?

25        A.    I -- I don't recall ever having seen that.

1    back and forth to find the continuation of your

2    particular survey.

3            So that's done before, and in that phase,

4    in this particular case, I don't recall if I

5    actually clicked through the, whatever, 15 or 20

6    questions on the -- on the pretest, but someone on

7    my staff is always doing that.

8        Q.   Who actually drafted the pretest survey?

9    Was it you?

10       A.   The -- the overall questions, Andreas

11   Groehn and I worked on that.  And then once it's in

12   a shape, discussed with the client and then it's

13   being sent for the programming to the vendors.

14       Q.   When did you draft it?

15       A.   So Andreas worked on that -- Dr. Groehn

16   worked on that in late December, and I literally

17   went through the final probably, like, the day or so

18   before it was rolled out.

19       Q.   Okay.  So if it was rolled out on

20   January 2nd, you might have looked at it on

21   January 1st?

22       A.   Yes.

23       Q.   Did anyone -- did Andreas or -- or anyone

24   else in your office evaluate the draft survey for

25   the purpose of understanding -- for the purpose of

1   sufficient for the purpose that I needed it for.

2            MS. LINDAHL:  All right.  We're going to

3   hand you a document that will be marked as

4   Exhibit 11.

5            (Whereupon Exhibit 11 was marked for

6            identification.)

7            THE WITNESS:  Okay.

8   BY MS. LINDAHL:

9        Q.   Do you recognize this document?

10       A.   It looks like an e-mail, which, at the

11   moment, I don't know if I've ever seen this before.

12   It's from May.  I didn't know what from

13   administrative group send on 6/22/2012, so I don't

14   -- I don't recognize this document.

15       Q.   And it has two -- two attachments,

16   correct?

17       A.   Two -- there is three pages here, my

18   document I'm looking at.

19       Q.   Right, there's two pages -- yeah,

20   they're -- they're separate --

21       A.   Three pages.

22       Q.   -- attachments.  Yes, three total pages --

23       A.   Yeah.

24       Q.   -- the cover e-mail and two attachments,

25   correct?

1      A.   Oh, if you count the charts as attachment,

2  yeah, okay, yeah, then there's -- this is three

3  pages, okay.

4      Q.   Okay.  I think we're saying the same

5  thing.

6      A.   Yes.

7      Q.   Do you see in -- under the heading of

8  "High-level conclusions," do you see that -- on the

9  first page on the cover e-mail, do you see that

10 there are some words that are in a different color

11 font?

12     A.   Yeah, the red font, I see that.

13     Q.   And are those attributes substantially the

14 same as the attributes that BRG selected for its

15 pretest survey?

16          MR. WOODS:  Objection.  The document

17 speaks for itself.  Also, object to form.

18          THE WITNESS:  I mean, energy efficiencies.

19 There are dimming.  We have dimming and dimming

20 range, flickering, price value, appearance.  There's

21 installation, lifetime, no wear, warm up.  I mean,

22 some of them --

23          [Reporter requests clarification.]

24          THE WITNESS:  Obviously, no maintenance,

25 warm up, on time, mercury, so there's overlap there.

1    Some of them are phrased a little differently, but

2    by and large, this is a good degree of overlap

3    between the categories.

4            MR. WOODS:  Counsel, was -- I'm sorry to

5    interrupt, was this produced in discovery?

6            MS. LINDAHL:  It was, yes.  We can -- we

7    can give you a Bates label for it.  I think, because

8    we printed it in color, the Bates didn't --

9            MR. WOODS:  Okay.  That would be good.

10   Just for the record, there is no Bates number on

11   this so I can't tell whether it's been produced or

12   not, but...

13   BY MS. LINDAHL:

14       Q.   Is this document included in the list of

15   documents that you state that you relied upon in

16   preparing your expert report?

17       A.   I mean, this document doesn't even have a

18   title or anything.  There's no Bates number so it's

19   impossible for me to say.  I have not seen this

20   document so I don't know if we ever received it or

21   not.

22       Q.   Did you review any of the documents that

23   Cree produced in discovery before -- while -- in

24   connection with preparing the pretest survey?

25       A.   I mean, I reviewed the pretest -- the

1   survey document, and most of the drafting, as I said

2   earlier, was done by Dr. Groehn and whoever on -- of

3   the support staff who had time in December.  So from

4   what I recall right now, I've not seen this

5   document, and right off the top of my head, I

6   couldn't list any other document that I looked at

7   and reviewed before the pretest survey went out.

8        Q.   Were there any people other than employees

9   of BRG who participated in drafting the pretest

10  survey before it went live to survey respondents?

11       A.   There was discussions with Counsel about

12  the pretest survey, but that was, from what I

13  recall, the -- the extent to it was -- to which it

14  was discussed.

15       Q.   Do you -- the first paragraph of this

16  e-mail starts with the -- the sentence, "I went

17  through the feedback."

18            Do you see that?

19       A.   Yes.

20       Q.   Are you familiar -- do you see that

21  there's five bullet points below that?

22       A.   Yes.

23       Q.   Are you familiar with any of the products

24  that are listed in those bullet points?

25       A.   I mean, the EcoSmart is something I do

1    January 18th, so -- but this seems to cover that

2    time period.

3          Q.   Okay.  So this invoice covers the time

4    period between the last bill and when your report

5    was submitted, plus a little extra, correct?

6          A.   What do you mean by "plus a little extra"?

7          Q.   You have some --

8          A.   This would be the --

9          Q.   -- time entries --

10         A.   Oh.

11         Q.   -- on the 30th and 31st of January.

12         A.   Let's see.

13              Oh, okay, yeah.  That was probably was in

14    relationship to a production request.  I see that,

15    yes.

16         Q.   Okay.  And if you turn with me, please, to

17    page 3 of 4, the pretest survey was live for survey

18    participants between January 2nd and January 6th,

19    correct?

20         A.   Yeah, I believe here, you -- it's in my

21    report.  January 2nd sounds about right for the

22    start date.  The 6th -- I mean, I would have to look

23    at the report, but it sounds about right.

24         Q.   Okay.  Can you --

25         A.   Since it --

1     Q.    Can you go ahead and confirm?

2     A.    Yes.

3           Yes.  Paragraph 94 in Boedeker 3, page 35

4     states January 2nd to January 6, 2019.

5     Q.    And your first time entry on this bill is

6     on January 5th, correct?

7     A.    Let me find that real quick.

8           Yes.

9     Q.    So you had not billed any time to this

10    matter before the pretest survey went live?

11    A.    Does not appear to be on this bill, that's

12    correct.

13    Q.    Is it typical for you to use the pretest

14    survey results to help you draft the conjoint

15    survey?

16    A.    Overall, the pretest results identify

17    product attributes that are important, and then the

18    conjoint menus, obviously, I have to include

19    attributes that are at the issue of the case, all

20    right?  So in this case, it would be one of the

21    longevity claims.  So therefore, I'm now looking for

22    other attributes that are important to the consumers

23    and then I'm kind of, like, wrapping what I'm really

24    interested in into some other attributes that are

25    typical, like relevance.  I mean, price always has

1  that's just a standard to filter down the group to

2  people who --

3          [Reporter requests clarification.]

4          THE WITNESS:  To filter down the group of

5  respondents to people who actually have had -- made

6  the decision to buy the product and then purchased

7  it.

8  BY MS. LINDAHL:

9      Q.   Are there any other portions of your

10  pretest survey that have questions or phrasing that

11  is identical to questions or phrasing in documents

12  that Cree produced in discovery?

13          MR. WOODS:  Objection.  Object to form.

14          THE WITNESS:  I don't know because, I

15  mean, these survey questions were -- were in the

16  one -- as I said, the decision-making process is --

17  is always a question in there.  The other ones, I

18  would have to -- to talk to staff.  If they copied

19  it from here or from some other source, I don't

20  know.

21  BY MS. LINDAHL:

22      Q.   Is it typical for your staff to copy

23  survey questions from case-related discovery

24  documents?

25      A.   I mean, copy survey questions, I mean,

1          THE WITNESS:  As I said, those are

2    questions that, in other surveys, I've also used,

3    questions that kind of like are not so much

4    revealing to what this is about, but there would be

5    questions that ultimately show that this -- this is,

6    like, just like any other survey, right, where it's

7    like a market research survey with -- with the --

8    with the context of lightbulbs.  Another thing is

9    that sometimes to -- to check the awareness of -- of

10   survey participants, I would throw in a question

11   that has multiple choice answers, and one of them is

12   a straight nonsense answer, right?  And so that way

13   you can see if people don't just, like, draw a line

14   down or click always the same box, right?  Those are

15   typical and best practices in survey methodology to

16   ensure that -- that reliable answers will be

17   recorded.

18   BY MS. LINDAHL:

19        Q.   Have you ever used the question "I'm

20   always looking for new ideas to prove my home" in a

21   pretest survey other than -- other than on this

22   occasion?

23        A.   On this one, I don't recall.

24        Q.   What about a question about

25   ecofriendliness, is that something that you

1    typically include in your pretest survey?

2        A.   I -- I worked on a case about laminated

3    flooring products where the allegations were that

4    they had excessive levels of formaldehyde, and there

5    was general questions about ecofriendliness and

6    labels on products, stamps of approval that follow

7    certain state guidelines.  So that's one that I

8    recall right off the top of my head where

9    ecofriendliness was definitely part of the -- the

10   survey.

11       Q.   Okay.

12            MS. LINDAHL:  Let's take just a very short

13   break just to clean up the table.

14            MR. WOODS:  Sure.

15            THE VIDEOGRAPHER:  Okay.  Going off the

16   record at 1:51 p.m.  This is end of Media No. 2.

17            (Recess.)

18            (Whereupon Exhibit 14 was marked for

19            identification.)

20            THE VIDEOGRAPHER:  Back on the record at

21   2:04 p.m., the start of Media No. 3.

22   BY MS. LINDAHL:

23       Q.   Okay.  We are going to hand you a document

24   that's been marked as Exhibit 14.  Take as long as

25   you need to review it, and my first question for you

1   demographics, that's correct.

2        Q.   So each survey participant would see

3   both -- each survey participant in the conjoint

4   phase of the study would see both the demographic

5   piece of this and then also a conjoint piece of it?

6        A.   Yeah.  Everybody who qualified due to the

7   different filters -- if a 16 year old starts, they

8   would filtered out.  If somebody never brought the

9   product, right, or was not part of the

10  decision-making process, they would be filtered out,

11  but whoever makes it to the conjoint portion would

12  then be randomly assigned to the 60- or the 100-watt

13  part of the conjoint study.

14       Q.   Okay.  And we're going to hand you a

15  document that's been marked as Exhibit 15.  I will

16  try not to make you flip back and forth too much.

17            (Whereupon Exhibit 15 was marked for

18            identification.)

19  BY MS. LINDAHL:

20       Q.   Do you recognize this document?

21       A.   That seems to be -- I haven't flipped

22  through all the pages, but this seems to be the --

23  what I called earlier the preprogramming version

24  that has the survey questions but then also the --

25  the actual conjoint menus, but this one doesn't show

1    the choice menus.  It just shows the description of

2    the attributes and then kind of like a blank matrix,

3    but it shows all of the levels of the attributes in

4    the conjoint.

5         Q.   So would this -- I believe that when we

6    were talking about the -- the pretest, you testified

7    that you provided the script to your vendor to set

8    up the online survey.

9              Is this the same type of document?

10        A.   Yeah, yeah, no.  You're using the word

11   "script."  I called it the preprogram --

12             [Reporter requests clarification.]

13             THE WITNESS:  I said that Counsel called

14   it "script," but I think I used the terminology

15   "preprogramming survey."

16             This is like the -- the questions written

17   down in survey format, in this case a Word document,

18   and then that would be used -- and typically there

19   would be a discussion going on once the vendor

20   received this over the phone to make sure that they

21   understood everything correctly.  And then the

22   screenshots are being produced after everything has

23   been programmed and a dry run is -- is done on the

24   survey itself -- the conjoint portion of the survey.

25   BY MS. LINDAHL:

1    Q.   Okay.  So this Exhibit 15 is sort of the

2    formula or the recipe that the vendor would use to

3    create these screenshots that are Exhibit 14; is

4    that an accurate way to describe it?

5    A.   Yeah, I mean, these are instructions,

6    including questions, but then also these terminate

7    what I call the instructions to the programmer.  And

8    then once this is literally written into computer

9    code so that it gives an online snapshot -- not a

10   snapshot, an online one by one, screen by screen

11   image of this, then the screenshots themselves could

12   be -- could be produced.

13   Q.   Okay.

14   A.   And I think the screenshots may actually

15   have been -- I can't really tell from here right

16   now, but sometimes you can just have a dry run

17   through the survey or other times you can just print

18   out what -- what an actual participant may have

19   answered as an example.  I don't know right now

20   what -- what was produced here.

21   Q.   We're still on this page, on -- and I'm

22   sorry for --

23   A.   Yeah.

24   Q.   -- having you have two documents open at

25   the same time, but we're still on the page --

1  want to go through the list here very quick.

2           I know lumen is not on there so then --

3  then lumen was not part of -- of -- there was no

4  reference to lumen that would have been -- would

5  have required this definition.  So, therefore,

6  probably the -- the vendor, through phone

7  conversations -- I mean, typically, one of my

8  staff -- I was on some of the calls, but in the days

9  of -- of the -- the programming, I mean, this is all

10  discussed with the vendor on the day of the

11  programming sometimes.  So maybe there was no

12  reference to lumen so it was unnecessary to have a

13  definition for lumen in there anymore.

14  BY MS. LINDAHL:

15      Q.   Okay.  Can you look with me, please, page

16  7 of Exhibit 15.

17      A.   Okay.  I'm there.

18      Q.   I'm looking at the definition of

19  "lifetime."

20      A.   Okay.

21      Q.   Who drafted that definition?

22      A.   Let me just read through it.

23           I mean, I -- I finally read through it and

24  I don't know who actually drafted it.  I mean,

25  Dr. Groehn with the attorneys, maybe.  I don't know.

1   There's definitely -- this was given to me and I

2   checked it, and, to me, it was sufficient to explain

3   lifetime in the context of this survey.

4        Q.   Do you know why energy costs -- or

5   information about energy costs is included in the

6   definition of "lifetime"?

7        A.   I mean, there's a reference to energy, the

8   Department of Energy, five times longer.  I don't

9   know.  It just seemed to be an add-on here in the

10  definition.  I don't know why it was included.

11       Q.   The -- the row above that includes

12  information about warranty.

13            Do you see that?

14       A.   Oh, the whole box above it, yeah, okay.  I

15  see that.

16       Q.   And the column on the right describes

17  three different warranties, correct?

18       A.   Yes.

19       Q.   Who drafted the language in that box?

20       A.   I mean, that may have also come from --

21  from discussions with Counsel or relative or maybe

22  even from the complaint, so these are, like, three

23  types of warranties that are offered as -- as levels

24  of an attribute in -- in this case.

25       Q.   What is meant by the phrase "100 percent

Page 158

1   So that's really helping the consumer to see three

2   different levels and then make a choice in a

3   tradeoff with other product comparisons.

4   BY MS. LINDAHL:

5        Q.   Can you look with me on page -- what page

6   are you on?  I'm on page --

7        A.   I'm on 7 --

8        Q.   9.

9        A.   -- right now.

10       Q.   Okay.  Let's look at 9.

11       A.   9, okay.

12            9, yep.  Okay, I'm on 9.

13       Q.   And just -- can you just explain for me

14   what's -- what is included in this table that starts

15   on page 9?

16       A.   These are, again, the descriptions of --

17   of the -- these are descriptions of -- of the

18   attributes.  Again, for, what it seems like in some

19   instances, the 60- and 100-watt participant groups.

20       Q.   So when we were looking at page 7, were we

21   looking at the definitions that a survey respondent

22   would see if they were to hover over a particular

23   term while taking the survey?

24       A.   Some on page 7, I would say page 9 and 10

25   are (unintelligible).

1           [Reporter requests clarification.]

2           THE WITNESS:  9, 10 and 11 are the ones

3    that actually have the values that correspond to

4    what is on the hovering thing, so I don't know how

5    the page 6 and 7 or whatever it was, or 7 got in

6    there.  The page 9 is -- is the expanded, edited

7    version, which, then, is the one, just looking at

8    the description for the warranty, for example, that

9    is in the survey itself.

10   BY MS. LINDAHL:

11        Q.   So would a -- would a survey respondent

12   ever have seen the information that's in -- that is

13   included in the table that starts on page 7?

14        A.   The page -- or the table on page 7.

15        Q.   Yeah.

16        A.   Again, this is this presurvey --

17   preprogramming survey is we're talking with the

18   vendor about doing it.  What it seems here is like

19   at page 9 and 10 are the ones -- and when I say "the

20   ones," are the attributes and their levels that are

21   also in the conjoint so that's what -- what the

22   participants saw.  Again, split into the 60 -- 60-

23   and 100-watt, the versions.

24        Q.   Okay.  So looking at page 9, the row that

25   has the attributes and levels for warranty has a

1    little bit -- has a couple more words in it than the

2    table on page 7?

3         A.   Let me just compare.

4              I saw some changes, because here I see you

5    have to pay for shipment, right?  So that's

6    definitely --

7         Q.   Yeah.

8         A.   -- different, yeah.

9         Q.   And I'm not trying to be difficult.  I'm

10   just trying to understand what page 7 is.

11        A.   Again, it looks like that page 7 is -- is

12   from -- from an iteration before page 9 because page

13   9 is actually the one that was, then, programmed and

14   made it into the conjoint survey that participants,

15   then, would see and then answer the questions in

16   that one rather than page 7.

17        Q.   Okay.  So we can put page 7 aside.  Let's

18   just look at page 9.

19             Who drafted choices 1, 2, and 3 in the row

20   called "Warranty"?

21        A.   Again, that was, for lack of a better

22   word, like a team effort, which I then signed off

23   on, and I know we -- we had discussions with

24   Counsel, right?  We had discussions among the team,

25   so this is probably like a -- a process that showed,

1   like, these are three levels that we want to

2   include.  I mean, ultimately, when -- when -- this

3   language was some that I -- I signed off on to be

4   included in the -- in the survey.

5       Q.   Do you know whether level 1, 2, or 3 in

6   the warranty row -- let me ask it differently, I'm

7   sorry.

8            Do you know whether Cree has ever had a

9   warranty for a consumer LED bulb that is consistent

10  with levels one, two, or three in the warranty row

11  between 2015 and 2019?

12           MR. WOODS:  Object to form.

13           THE WITNESS:  I'm not aware of -- I have

14  not studied any warranties that Cree may or may not

15  have had.  Again, this is, like, in the conjoint

16  menu having the warranty attribute with three

17  different levels to see if consumers show -- if --

18  if any of these levels has different impacts on

19  consumer demand, right?  That's what this is for.

20  So this -- in the actual study, this could easily be

21  replaced with -- with warranties that were out there

22  in the market by Cree or any other retailer, but

23  since I didn't do a separate warranty analysis or

24  study, I used these three levels.  This is -- so

25  warranty is the attribute, and then on the right

1   side, the descriptions would be the levels that the

2   consumer or participant ultimately sees in the

3   conjoint study.

4   BY MS. LINDAHL:

5       Q.   Do you see the next row down there's an

6   attribute called "Lifetime"?

7       A.   Yes.

8       Q.   And then different choices for 60-watt and

9   100-watt?

10      A.   Yes.

11      Q.   Who drafted the different choices for

12  60-watt and 100-watt in the row called "Lifetime"?

13      A.   That is the same, right?  I mean, we had

14  discussions with Counsel.  We put down different

15  variations.  At the end here, we have an attribute

16  with four levels, and then basically that's what was

17  included in the survey, but who actually contributed

18  what element of that, I don't recall.  But, again,

19  that was the -- the -- the result of a discussion.

20      Q.   How were these levels selected -- let me

21  ask differently.

22           Why were these specific levels selected?

23      A.   Again, there -- there is -- the comparison

24  here is like the -- the four years and then lifetime

25  savings over incandescent bulbs, and then it goes

Page 164

1    trend.

2         Q.   So the four levels, do those represent

3    different representations that an LED lighting

4    manufacturer would make on its packaging or other

5    marketing materials?

6              MR. WOODS:  Object to form.

7              You can answer.

8              THE WITNESS:  I mean, I -- I could imagine

9    that those are -- without pointing to a particular

10   package or marketing material but that those are

11   kind of like items that can be put out.  And, again,

12   from just a few pictures we looked at earlier, I

13   mean, the lifetime savings or -- or hours or years

14   of -- of lifespan are on packages in general and are

15   used, right, to basically indicate that products

16   have the longevity attribute or characteristic.  And

17   here, I wanted to measure if specifying specific --

18   or specifying the amount of time that the lifetime

19   covers, if there's any correlation, right?  You

20   could say at some point, it may flatten out.  At

21   other points, it keeps on going.  So I just wanted

22   to have data points that enabled me to see if the

23   actual lifetime plays a role.  And this is really

24   with respect to devaluate a model --

25              [Reporter requests clarification.]

1           THE WITNESS:  De -- it's with respect with

2    the goal to devaluate a model to show to the trier

3    of fact that this is the model that can be used and

4    it's flexible enough to model different input

5    parameters.  I mean, as I sit here right now, I

6    don't know what the exact lifetime is of the

7    products in question, but with this one, I -- I

8    could now model a comparison if the lifetime

9    increases or decreases, right?  Will that have an

10   impact on -- on the demand for those products?  And

11   the demand would be, you know, how much are people

12   paying for a product like that.  That was the reason

13   to -- to include this attribute and choose

14   particular levels.

15   BY MS. LINDAHL:

16       Q.   So is this attribute seeking to measure

17   how a consumer would value the difference in the

18   actual lifetime of a bulb or a different

19   representation to the consumer about the lifetime of

20   the bulb?

21           MR. WOODS:  Object to form.

22           You can answer.

23   BY MS. LINDAHL:

24       Q.   Do you understand what I mean?

25       A.   Not quite.  I mean, I -- why don't you

Page 192

1    prices that were actually chosen are the one in my

2    report.

3         Q.   So --

4         A.   And then the report mentions the -- the

5    conjoint choice menu.

6         Q.   So at one point before your report was

7    finalized, were you considering using the price

8    levels that start on page 10 and continue onto page

9    11 of Exhibit 15?

10        A.   I mean, this is what I considered, right?

11   So this -- as I said, this may just be an earlier

12   draft which then wasn't even discussed with the --

13   with the vendor because the vendor used the data

14   points you see in my report that are also reflected

15   in the -- in the example of the choice menu on

16   Exhibit 14.

17        Q.   Do you know why there were different price

18   levels included in Exhibit 15 than ultimately wound

19   up in the conjoint model set forth on Exhibit -- in

20   Exhibit 14?

21        A.   I don't recall that.

22        Q.   Okay.

23             MR. WOODS:  Is this a good time?

24             MS. LINDAHL:  Sure.

25             THE VIDEOGRAPHER:  Okay.  Going off the

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

JEFF YOUNG,

     Plaintiff,

     vs.

CREE, INC.,

     Defendant.

CASE NO. 17-cv-06252-YGR

**ORDER RE: MOTION TO DISMISS**

Re: Dkt. Nos. 31, 32

Plaintiff Jeff Young brings this putative class action lawsuit against defendant Cree, Inc. ("Cree") alleging that defendant engaged in an "unfair and deceptive practice of . . . promising consumers" that Cree's light-emitting-diode bulbs (the "LED Bulbs") "will last for particularly long periods of time up to 35,000 hours" with a "100% Satisfaction Guarantee" and "yearly energy cost savings ranging from around $0.60 to $2 per blub per year" in violation of California's Unfair Competition Law ("UCL"), Cal. Bus. Prof. Code §§ 17200, *et seq.* (Count I); (False Advertising Law ("FAL"), Cal. Bus. Prof. Code §§ 17500, *et seq.* (Count II); Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1750, *et seq.* (Count III);[1] fraudulent misrepresentation and concealment (Count V); negligent misrepresentation (Count VI); unjust enrichment (Count VII); breach of express and implied warranties (Count VIII);[2] and negligent failure to test (Count IX). (Dkt. No. 1, Class Action Compliant ("CAC").)

---

[1] Plaintiff has withdrawn his claim for breach of the covenant of good faith and fair dealing (Count IV). (Dkt. No. 37, Opposition at 1.)

[2] Plaintiff's complaint designates two separate causes of action as "Count VII," namely claims for unjust enrichment and breach of express and implied warranties. In the interest of clarity, the Court has re-designated the breach of express and implied warranties claim as "Count VIII."

EXHIBIT 9
BOEDEKER
Tuesday, March 12, 2019

Reported by:   Elizabeth Borrelli
CSR 7844, CCRR, CLR

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Now before the Court is defendant's motion to dismiss.[3] (Dkt. No. 31, Motion to Dismiss

2    ("MTD").)  Having carefully considered the pleadings and fully-briefed motion, the hearing held

3    on April 3, 2018, and for the reasons set forth below, the Court **GRANTS IN PART** and **DENIES IN**

4    **PART** defendant's motion as described below.

5    **I.    BACKGROUND**

6        As relevant here, the complaint alleges as follows:

7        Defendant Cree "advertise[s], market[s], distribute[s], or s[ells]" LED Bulbs "to consumers

8    throughout the United States."  (CAC ¶ 12.)  "[O]n or around April of 2015" Young purchased

9    three of defendant's LED Bulbs at Walmart and paid "approximately $15-20 for each bulb."  (*Id.* ¶

10   32.)  "Within months, all three [LED Bulbs] burned out even though [plaintiff] used them

11   according to the instructions."  (*Id.* ¶ 32.)

12       "Cree's packaging offers a '100% Satisfaction Guarantee' for LED Bulbs and an estimated

13   lifetime of between 15–32 years depending on the product.  The packages further offer an

14   estimated yearly energy cost savings ranging from $0.60 to $2 per bulb per year.  Cree packaging

15   also offers a '10 Year Warranty.'"  (*Id.* ¶¶ 3, 27.)  Moreover, Cree's website "boast[s] . . . a 10

16   year 100% satisfaction guarantee."  (*Id.* ¶ 4.)  Plaintiff alleges that these "marketing efforts are

17   made in order to—and do in fact—induce its customers to purchase the LED bulbs at a premium

18   because consumers believe the Lightbulbs will last for far longer than their actual life."  (*Id.* ¶ 5.)

19   Based thereon, plaintiff asserts "Cree's claims regarding the longevity of the LED Lightbulbs are

20   false."  (*Id.* ¶ 6.)

21   **II.   LEGAL FRAMEWORK**

22       **A.    Motion to Dismiss**

23       Pursuant to Rule 12(b)(6), a complaint may be dismissed for failure to state a claim upon

24   which relief may be granted.  Dismissal for failure to state a claim under Federal Rule of Civil

25   _____

26       [3] Also before the Court is defendant's request for judicial notice of the front and back
     packaging for three types of Cree LED Blubs.  (Dkt. No. 32.)  In light of the lack of opposition,
27   the Court **GRANTS** defendant's request for judicial notice, but does not accept the truth of any
     matters asserted in the documents.  The Court gives such documents their proper evidentiary
28   weight.

2

United States District Court
Northern District of California

1   Procedure 12(b)(6) is proper if there is a "lack of a cognizable legal theory or the absence of

2   sufficient facts alleged under a cognizable legal theory." *Conservation Force v. Salazar*, 646 F.3d

3   1240, 1242 (9th Cir. 2011) (citing *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir.

4   1988)).  The complaint must plead "enough facts to state a claim [for] relief that is plausible on its

5   face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is plausible on its face

6   "when the plaintiff pleads factual content that allows the court to draw the reasonable inference

7   that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678

8   (2009).  If the facts alleged do not support a reasonable inference of liability, stronger than a mere

9   possibility, the claim must be dismissed. *Id.* at 678–79.  Mere "conclusory allegations of law and

10  unwarranted inferences are insufficient to defeat a motion to dismiss." *Adams v. Johnson*, 355

11  F.3d 1179, 1183 (9th Cir. 2004).  In ruling on a motion to dismiss, "the court must presume all

12  factual allegations of the complaint to be true and draw all reasonable inferences in favor of the

13  nonmoving party." *Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 984 (9th Cir. 2000).

14      Additionally, claims sounding in fraud are subject to the heightened pleading requirements

15  of Federal Rule of Civil Procedure 9(b). *Vess v. Ciba–Geigy Corp. USA*, 317 F.3d 1097, 1103–04

16  (9th Cir. 2003).  "In alleging fraud or mistake, a party must state with particularity the

17  circumstances constituting fraud or mistake.  Malice, intent, knowledge, and other conditions of a

18  person's mind may be alleged generally." Fed. R. Civ. Proc. 9(b).  "Averments of fraud must be

19  accompanied by the who, what, when, where, and how of the misconduct charged." *Kearns v.*

20  *Ford Motor Co.*, 567 F.3d 1120, 1124 (9th Cir. 2009).  These requirements "ensure that

21  allegations of fraud are specific enough to give defendants notice of the particular misconduct

22  which is alleged to constitute the fraud charged so that they can defend against the charge and not

23  just deny that they have done anything wrong." *Semegen v. Weidner*, 780 F.2d 727, 731 (9th Cir.

24  1985).

25      **B.     Preemption**

26      Preemption is fundamentally a question of congressional intent. *Wyeth v. Levine*, 555

27  U.S. 555, 565 (2009).  "Federal preemption occurs when: (1) Congress enacts a statute that

28  explicitly pre-empts state law; (2) state law actually conflicts with federal law; or (3) federal law

1    occupies a legislative field to such an extent that it is reasonable to conclude that Congress left

2    no room for state regulation in that field." *Chae v. SLM Corp.,* 593 F.3d 936, 941 (9th Cir. 2010)

3    (internal quotation marks and citations omitted).

4            While the Court's interpretation of a preemption statute "must begin with its text," that

5    interpretation "does not occur in a contextual vacuum." *Medtronic, Inc. v. Lohr,* 518 U.S. 470,

6    484–85 (1996); *see Altria Group, Inc. v. Good,* 555 U.S. 70, 76 (2008) (stating that, even "[i]f a

7    federal law contains an express pre-emption clause, it does not immediately end the inquiry

8    because the question of the substance and scope of Congress' displacement of state law still

9    remains."). In analyzing the issue, a court must begin with the presumption that unless a "clear

10   and manifest purpose of Congress" exists, federal acts should not supersede the historic police

11   powers of the states. *Wyeth,* 555 U.S. at 565; *Lohr,* 518 U.S. at 485. "Parties seeking to

12   invalidate a state law based on preemption 'bear the considerable burden of overcoming the

13   starting presumption that Congress does not intend to supplant state law.'" *Stengel v. Medtronic,*

14   704 F.3d 1224, 1227–28 (9th Cir. 2013) (*en banc*) (quoting *De Buono v. NYSA–ILA Med. &*

15   *Clinical Servs. Fund,* 520 U.S. 806, 814 (1997)).

16           Preemption is express where Congress has considered the issue of preemption and

17   included in the enacted legislation a provision explicitly addressing that issue. *Valentine v.*

18   *NebuAd, Inc.*, 804 F. Supp. 2d 1022, 1028 (N.D. Cal. 2011) (citing *Cipollone v. Liggett Group,*

19   505 U.S. 504, 517 (1992)). In the absence of explicit preemptive language, congressional intent

20   to preempt can be implied under two scenarios: field preemption and conflict preemption. First,

21   field preemption occurs "where the scheme of federal regulation is 'so pervasive as to make

22   reasonable the inference that Congress left no room for the States to supplement it.'" *Valentine,*

23   804 F. Supp. 2d at 1028 (quoting *Gade v. Nat'l Solid Wastes Mgmt. Ass'n,* 505 U.S. 88, 98

24   (1992)). Field preemption should not be found in the absence of persuasive reasons—either that

25   the nature of the regulated subject matter permits no other conclusion, or that, without question,

26   Congress has so ordained. *Valentine,* 804 F. Supp. 2d at 1028–29 (such preemption arises in

27   only extraordinary circumstances). Second, conflict preemption arises when "compliance with

28   both federal and state regulations is a physical impossibility." *Id.* (internal citations omitted).

1    Conflict preemption may also exist where "state law 'stands as an obstacle to the

2    accomplishment and execution of the full purposes and objectives of Congress.'" *Id.* (internal

3    citations omitted).  Showing preemption by impossibility is a "demanding defense." *Wyeth*, 555

4    U.S. at 573.

5        **C.**    **Energy Policy and Conservation Act**

6        The Energy Policy and Conservation Act (the "EPCA") establishes a national energy

7    conservation program to reduce energy use in the United States by creating various requirements

8    with regard to (i) energy efficiency, (ii) efficiency testing, (iii) operating costs, and (iv) labeling

9    requirements.  42 U.S.C. §§ 6291-6309; *see also* S. Rep. No. 94-516, at 517 (1975), reprinted in

10   1975 U.S.C.C.A.N. 1956, 1957.  Under the EPCA, LED bulb manufacturers must disclose certain

11   information on their product packaging.  16 C.F.R. 305.15.  The product's "principal display

12   panel" must include the LED bulb's estimated annual energy cost, "expressed as 'Estimated

13   Energy Cost' in dollars and based on usage of 3 hours per day and 11 cents ($0.11) per kWh."  16

14   C.F.R 305.15(b)(1).  The package's "Lighting Facts" label must further include the estimated

15   lifespan of each bulb.  16 C.F.R. 305.15(b)(3).

16       Illustrative examples of the required disclosures are depicted below:

17   **Principal Display Panel**        **Lighting Facts Label**

18       

24   The EPCA provides that these required disclosures do not give rise to express or implied

25   warranties.  Specifically, Section 6297(g) of the EPCA provides:

26   //

27   //

28   //

United States District Court
Northern District of California

1  Any disclosure with respect to *energy use, energy efficiency, or estimated annual operating cost which is required to be made* under the provisions of this part *shall not create an express or implied warranty under State or Federal law* that such energy efficiency will be achieved or that such energy use or estimated annual operating cost will not be exceeded under conditions of actual use.

4  42 U.S.C. § 6297(g) (emphasis supplied).

5  **III.   DISCUSSION**

6  Defendant argues that plaintiff's claims fail because the claims are (i) preempted by the EPCA and, in any event, (ii) not sufficiently pled.  Defendant also claims that Young lacks standing to bring claims for alleged misrepresentations regarding certain types of LED Bulbs which he did not purchase.

10  **A.   EPCA Preemption**

11  As an initial matter, the Court must determine whether plaintiff's claims are preempted by the EPCA.  As noted, the EPCA states that "[a]ny disclosure with respect to energy use, energy efficiency, or estimated annual operating cost which is required to be made under the [EPCA] . . . shall not create an express or implied warranty under State or Federal law."  42 U.S.C. § 6297(g). Several district courts interpreting Section 6297(g) have held that the EPCA preempts both warranty and non-warranty claims which arise from defendant's "disclosure[s] with respect to energy use, energy efficiency, or estimated annual operating cost which [are] required to be made under the [EPCA]."  *See Schwartz v. Vizio, Inc.,* 2017 WL 2335364, at *4 (C.D. Cal. 2017) (citing 42 U.S.C. § 6297(g)); *Jurgensen v. Felix Storch, Inc.*, 2012 WL 2354247, at *7 (S.D.N.Y. 2012). Stated differently, Section 6297(g) "expressly preempts all . . . claims [which] allege that [consumer products] did not perform as promised on a federally-required label."  *Id.*

22  *Schwartz* is instructive.  There, plaintiff brought warranty and non-warranty claims[4] alleging that defendant's representations regarding energy efficiency contained within a federally-

---

[4] Plaintiff's warranty claims included causes of action for breach of express warranty and implied warranty of merchantability.  *Schwartz,* 2017 WL 2335364, at *1.
Plaintiff's non-warranty claims included causes of action for violations of Illinois' Consumer Fraud and Deceptive Business Practices Act; Pennsylvania's Unfair Trade Practices and Consumer Protection Law; negligent misrepresentation; fraudulent concealment; intentional misrepresentation; fraud; and unjust enrichment.  *Schwartz,* 2017 WL 2335364, at *1.

1   required energy label were misleading.  *Id.* at *1.  In granting defendant's motion to dismiss, the

2   *Schwartz* court held that plaintiff's warranty claims were preempted under the EPCA and the non-

3   warranty claims were similarly preempted on the ground that the non-warranty claims were

4   "simply . . . backdoor" attempts to recast "a breach of warranty claim."  *Id.* at *4 (internal

5   quotations omitted); *see also Jurgensen,* 2012 WL 2354247, at *1 (finding plaintiff's unjust

6   enrichment claim preempted because it was merely a "backdoor" to a warranty claim); *Gee v.*

7   *Viking Range Corp.,* WL 4416442, at *2 (N.D. Miss. 2008) (non-warranty claims barred because

8   the such claims were "inextricably intertwined with warranty claims which are barred by

9   §6297(g)").

10          Here, plaintiff asserts his claims do not arise from statements which appear within the LED

11   Bulbs' principal display panels or Lighting Facts labels but from representations which appear

12   elsewhere on the product packaging or on the internet.  (*See* Opposition at 6.)  Upon review, the

13   Court finds three categories of alleged misrepresentations, namely those which (i) reiterate

14   disclosures required to be made on the product's principal display panel or Lighting Facts label;

15   (ii) present information regarding *comparative* energy consumption, energy savings, and lifespan;

16   and (iii) state that Cree's products are "100% Satisfaction Guaranteed."  Examples of each

17   category are depicted below.

18   **First Category**

19
20   
21

22

23   **Second Category**

24
25   
26

27   † At $.011 per kWh when compared to 60W incandescent, 30,000 hour lifetime.

28

**Third Category**



\* This product is guaranteed to give 100% performance satisfaction and is covered by a limited warranty. If within 5 years from the date of purchase you are not completely satisfied with the performance of this product, return the product to Cree . . . [and] Cree will send you a replacement or at Cree's option refund the original purchase price. Cree may require a purchase receipt.

### 1.    First Category: Reiterations of Federally-Required Disclosures

Several courts have held that statements which merely reiterate the content of federally-required disclosures are preempted. *See Cooper v. United Vaccines, Inc.*, 117 F. Supp. 2d 864, 871–872 (E.D. Wis. 2000) (adopting a "sensible and practical approach" which "focuses the preemption issue upon the content and language of the representation at issue" rather than the physical placement of the representation); *see also Kuiper v. American Cyanamid Co.*, 913 F. Supp. 1236, 1244 (E.D. Wis. 1996) (finding the reiteration of federally-required label information not actionable; *Kanter v. Warner–Lambert Co.*, 99 Cal. App. 4th 780, 797 (2002) (statements which are "simply alternative explanations" of those contained in federally mandated labels are preempted).

Here, plaintiff's claims are preempted to the extent that such claims arise from the first category of alleged misrepresentations, namely those statements which merely reiterate the information required to be disclosed on the LED Bulbs' principal display panel or Lighting Facts label pursuant to the EPCA.[5] Such statements include representations regarding the "estimated

---

[5] Plaintiff argues that the first category of representations goes beyond the federally-required disclosures and is not preempted because these representations omit or alter the information which appears in the Lighting Facts Panel. For example, the Lighting Facts Panel states that the lifespan of the LED Bulb is "27.4 years" based on "3 hrs/day" of use whereas the challenged representation states that the LED Bulb is "27+ years rated lifetime." Plaintiff's argument fails in light of the fact that the federally-required disclosure and challenged representation both address the "estimated lifespan of the light bulb," 16 C.F.R. § 305.15(c), and were displayed in close proximity on the LED Bulb's packaging.

1    lifespan of the light bulb."[6] *See* 16 C.F.R. § 305.15(c), 16 C.F.R. § 305.2(w); (CAC ¶ 16).

2    Accordingly, defendant's motion to dismiss is **GRANTED** to the extent that plaintiff's claims arise

3    from statements which simply reiterate federally-required disclosures.

### 2.    Second Category: Comparative Performance

5    With regard the second category, and, by contrast to mere reiterations, statements which

6    are "substantially different" from the federally-required disclosures are not preempted. *Cooper*,

7    117 F. Supp. 2d at 871–72; *see also Taylor AG Industries v. Pure–Gro*, 54 F.3d 555, 563 (9th Cir.

8    1995) (finding claims based on oral statements made by a distributor preempted because there was

9    no evidence that the statements "were inconsistent with or went beyond the labels").  These

10   include representations regarding energy consumption, lifetime energy savings, and lifespan as

11   compared to competing products.

12   *In re Ford* is instructive.  There, plaintiffs alleged that Ford made misleading comparisons

13   between Ford's Fusion cars and competing hybrid vehicles using figures derived from federally-

14   mandated fuel efficiency disclosures. *In re Ford Fusion and C–Max Fuel Economy Litig.*, 2015

15   WL 7018369 at *2–3 (S.D.N.Y. 2015).  The court held that plaintiffs' claims were preempted to

16   the extent that such claims arose from Ford's presentation of federally-mandated fuel efficiency

17   estimates. *Id.* at *27.  However, the court also found that claims based on Ford's representations

18   which *compared* the fuel efficiency of Ford's Fusion cars to that of Ford's competitors were not

19   preempted on the ground that such statements "go beyond merely reporting the EPA-estimated

20   MPG." *Id.* at *26; *see also Yung Kim v. General Motors, LLC*, 99 F. Supp. 3d 1096, 1104 (C.D.

21   Cal. 2015) (finding representations based on federally-mandated EPA estimates not preempted by

22   the EPCA because the representations could lead reasonable consumers to believe the vehicles

23   would be "able to achieve real-world mileage and tank range derived from those figures").  In

24   denying defendant's motion to dismiss, the court highlighted that plaintiffs' consumer protection

---

26

27        [6] To the extent that the complaint alleges misrepresentations which convey the LED
     Bulbs' estimated lifespan in hours as opposed to years such statements are similarly preempted.
28   *See Cooper*, 117 F. Supp. 2d at 871–72.  The simple arithmetic conversion of years to hours
     does not change the content of the challenged representation.

1    claims "were not based on the disclosure of fuel economy or fuel operating costs, but rather [were]

2    based on the more general duty not to deceive," which Ford violated by "portraying a false impression

3    about the 'superior' fuel economy of the [vehicles], beyond the mere disclosure of the EPA estimates."

4    *Id.* at *24.

5         Here, plaintiff challenges several representations which tout the performance of Cree's

6    LED Bulbs *when compared to competing bulbs*, including representations on Cree's website that

7    its LED Bulbs will last "up to 3x as long as the cheap LED bulbs" and on the packaging which

8    indicates that customers will save $95-177 by using a Cree LED Bulb.  (CAC ¶¶ 19–27.)  Such

9    statements "go beyond merely reporting the EPA-estimated" bulb lifespan and convey an

10   allegedly "false impression about the superior" longevity and cost savings of Cree's LED Bulbs.

11   *In re Ford Fusion*, 2015 WL 7018369 at *24 (internal quotations omitted).  These representations

12   give rise to a plausible inference that reasonable consumers would believe the Cree's LED Bulbs

13   are "able to achieve real-world" lifespan and cost savings. *See Yung Kim*, 99 F. Supp. 3d at 1104.

14        Accordingly, defendant's motion to dismiss is **DENIED** to the extent that such claims

15   challenge the second category of alleged misrepresentations, namely those that purport to compare

16   the longevity, energy consumption, and cost savings of defendant's LED Bulbs to competitors'

17   LED and incandescent bulbs.

18              **3.      Third Category: 100% Satisfaction Guaranteed**

19        With regard to the third category, which includes representations that the LED Bulbs are

20   "100% Guaranteed[,]" such representations are not preempted.  Such representations are not

21   required by EPCA and therefore fall outside the purview of Section 6297(g). *See In re Ford*, 2015

22   WL 7018369 at *1 (holding "any allegations that go beyond the mere disclosure . . . [of

23   information required by the statute], go beyond the scope of the EPCA"); *see also True v. Honda

24   Motor Co.*, 520 F. Supp. 2d 1175, 1181 (C.D. Cal. 2007) (claims not preempted because the

25   challenged representations were not within the scope of a federally-mandated disclosure).

26           **B.      Sufficiency of Allegations**

27        Having determined that plaintiff's claims are preempted only to the extent that such claims

28   arise from the first category of representations, the Court now turns to whether plaintiff's claims

United States District Court
Northern District of California

1    arising from non-preempted representations are sufficiently pled as to each category of alleged

2    misrepresentations.

### 1.    Second Category: Comparative Performance
#### a.    Claims Sounding in Fraud: UCL, FAL, CLRA, and Fraudulent Misrepresentation and Concealment

5        Plaintiff alleges four causes of action involving allegations sounding in fraud, namely

6    claims under the UCL (Count I), FAL (Count II), and CLRA (Count III), and for fraudulent

7    misrepresentation and concealment (Count V).  All four claims require plaintiff to allege a false or

8    misleading statement, scienter, intent, reasonable reliance, and damages.  *See Bank of the West v.*

9    *Valley Nat. Bank of Arizona*, 41 F.3d 471, 477 (9th Cir. 1994) (citing *Hackethal v. Nat Cas. Co.*,

10   189 Cal. App. 3d. 1102, 1111 (1987)).  In a deceptive advertising case involving allegations of

11   fraud, "Rule 9(b) requires that the plaintiff(s) identify specific advertisements and promotional

12   materials; allege when the plaintiff(s) were exposed to the materials; and explain how such

13   materials were false or misleading."  *Janney v. Mills*, 944 F. Supp. 2d 806, 818 (N.D. Cal. 2013).

14   Defendant asserts that plaintiff fails to allege (i) Cree's scienter and (ii) the circumstances

15   surrounding the alleged fraud including Young's reliance.

16       With respect to defendant's first argument, plaintiff alleges that defendant "designed,

17   formulated, tested, manufactured, inspected, distributed, marketed, supplied, and/or sold" the LED

18   Bulbs at issue.  (CAC ¶ 125.)  According to plaintiff, Cree claims on its website that it "designs

19   and tests its bulbs to last longer, with rated lifetimes equal to or exceeding Energy Star minimum

20   requirements."  (*Id.* ¶ 26.)  These allegations, particularly those related to testing, are sufficient to

21   create a reasonable inference that Cree knew that the challenged representations were false.  *See*

22   *Kowalsky v. Hewlett–Packard Co.*, 2011 WL 3501714 (N.D. Cal. 2011) (finding plaintiff's

23   allegation that defendant tested its products sufficient to create a plausible inference that defendant

24   had knowledge of a product defect); *Avedisian v. Mercedes–Benz USA, LLC*, 2013 WL 2285237,

25   at *7 (C.D. Cal. 2013) (same).

26       Turning to Cree's second argument, plaintiff alleges that defendant knowingly made false

27   representations and concealed material facts regarding the "quality, durability, longevity and

28   benefits of [Cree's] LED Lightbulbs."  (CAC ¶¶ 46–47, 48, 50, 57, 58, 66, 67, 70.)  Plaintiff

United States District Court
Northern District of California

identifies the specific advertisements and marketing materials which he claims are false and misleading. (*Id.* ¶¶ 15, 16, 17, 19, 20, 21, 23, 24, 25, 27.)  Next, plaintiff alleges that he was exposed to the false representations when he purchased the LED Bulbs from Walmart in April of 2015. (*Id.* ¶ 32.)  Further, he claims he would not have purchased the bulbs, or would not have paid as much for them, absent the alleged misrepresentations. (*Id.* ¶¶ 50, 60, 68, 90, 97, 122.)  Plaintiff alleges that these representations are false and misleading because the LED Bulbs "do not last nearly as long as advertised. (*Id.* ¶ 6.)  However, plaintiff fails to plead his reliance and does not identify the specific representations on which he relied.

Accordingly, defendant's motion to dismiss is **GRANTED** with respect to plaintiff's claims under the UCL (Count I), FAL (Count II), CLRA (Count III), and for fraudulent misrepresentation and concealment (Count V) with leave to amend to plead plaintiff's reliance and identify the specific representations on which he relied.

### b.    Negligence Claims

Plaintiff alleges two causes of action for negligence, namely negligent misrepresentation (Count VI)[7] and negligence in design based on Cree's failure to test its LED Bulbs adequately (Count IX).  Defendant argues that both negligence claims are barred by the economic loss rule.

"The economic loss rule requires a purchaser to recover in contract for purely economic loss due to disappointed expectations, unless he can demonstrate harm above and beyond a broken contractual promise." *Ladore v. Sony Comput. Entm't Am.*, 75 F. Supp. 3d 1065, 1074 (N.D. Cal. 2014) (quoting *Tasion Communications v. Ubiquiti Networks, Inc.*, 2013 WL 4530470, at *3 (N.D. Cal. 2013)).  "[T]he economic loss rule has been applied to bar a plaintiff's tort recovery of economic damages unless such damages are accompanied by some form of *physical harm* (i.e., personal injury or property damage)." *Id.* (emphasis in original) (citing *North Am. Chem. Co. v.*

---

[7]  "In California, the elements of negligent misrepresentation are '(1) a misrepresentation of a past or existing material fact, (2) made without reasonable ground for believing it to be true, (3) made with the intent to induce another's reliance on the fact misrepresented, (4) justifiable reliance on the misrepresentation, and (5) resulting damage.'" *Yamauchi v. Cotterman*, 84 F. Supp. 3d 993, 1018 (N.D. Cal. 2015) (quoting *Ragland v. U.S. Bank Nat. Assn.*, 209 Cal. App. 4th 182, 196 (2012)).

United States District Court
Northern District of California

*Superior Court*, 59 Cal. App. 4th 764, 777 (1997)). "Put more precisely, in actions arising from the sale or purchase of a defective product, plaintiffs seeking economic losses must be able to demonstrate that either physical damage to property (other than the defective product itself) or personal injury accompanied such losses; if they cannot, then they would be precluded from any tort recovery in strict liability or negligence." *Id.* (quoting *North Am. Chem.*, 59 Cal. App. 4th at 780). The economic loss rule "prevents the law of contract and the law of tort from dissolving into one another." *Robinson Helicopter Co., v. Dana Corp.*, 34 Cal. 4th 979, 988 (2004).

Several California courts and federal courts in this district have recognized an exception to the economic loss rule. *See Robinson Helicopter,* 34 Cal. 4th at 989–93; *JMP Securities LLP, v. Altair Nanotechnologies Inc.*, 880 F. Supp. 2d 1029, 1043–44 (N.D. Cal. 2012). Specifically, a plaintiff seeking economic damages for a negligence claim "will [not] be barred by the economic loss rule [where] the plaintiff alleges that the defendant made an affirmative representation, and that the defendant's representation exposed the plaintiff to independent personal liability." *Crystal Springs Upland School v. Fieldturf USA, Inc.*, 219 F. Supp. 3d 962, 970 (N.D. Cal. 2016) (dismissing negligent misrepresentation claim because plaintiff did not allege exposure to independent personal liability); *see also Westport Ins. Corp. v. Vasquez, Estrada and Conway LLP*, 2016 WL 1394360, at *5–7 (N.D. Cal. 2016) (claim for negligent misrepresentation barred under the economic loss rule because the alleged tortious conduct was not separate from the breach of contract); *Nada Pac. Corp. v. Power Eng.g & Mfg., Ltd.*, 73 F. Supp. 3d 1206, 1224–25 (N.D. Cal. 2014) (same).[8]

---

[8] Defendant raises two additional arguments in its motion regarding plaintiff's negligence actions. First, defendant argues that plaintiff cannot bring a claim for "negligence—failure to test" because it is not a valid cause of action in California. This argument is without merit. California courts have held that the "duty to test is a subpart of the other three duties [to safely manufacture, adequately design, and appropriately warn]." *Valentine v. Baxter Healthcare Corporation*, 68 Cal. App. 4th 1467, 1486 (1999); *see also  Gordon v. Aztec Brewing Co.*, 33 Cal. 2d 514, 520 (1949) (finding "negligence in the defendant's failure to test"); *Centeno v. Bayer HealthCare Pharm. Inc.*, 2014 U.S. Dist. LEXIS 136234, at *8-9 (S.D. Ill. 2014) (applying California law and denying dismissal of a negligence claim by finding that "failure to test" is a factual allegation supporting a claim that defendants were negligent and brings it "within the ambit of *Valentine*, which recognizes that testing and inspection duties may be tied to liability for manufacture, design, and failure to warn, even if they are not maintainable as an independent duty").

13

United States District Court
Northern District of California

1  Here, plaintiff does not allege that he suffered "physical harm" or that he was exposed to

2  personal liability as a result of defendant's alleged misrepresentations.  Accordingly, defendant's

3  motion to dismiss plaintiff's claims for negligent misrepresentation (Count VI) and negligent

4  failure to test (Count IX) is **GRANTED** on the ground that such claims are barred by the economic

5  loss rule.  Plaintiff is granted leave to file an amended complaint which alleges, if possible, that he

6  was exposed to "independent personal liability."

### c.      Unjust Enrichment

8  Defendant argues that plaintiff's cause of action for unjust enrichment (Count VII) should

9  be dismissed because it is not a cause of action in California.  Defendant's argument fails as the

10  California Supreme Court has clarified that unjust enrichment is a valid cause of action in

11  California. *See Hartford Cas. Ins. Co. v. J.R. Mktg., L.L.C.*, 61 Cal. 4th 988, 1000 (2015)

12  (clarifying California law and allowing an independent claim for unjust enrichment).

13  Accordingly, defendant's motion to dismiss plaintiff's claim for unjust enrichment is

14  **DENIED**.

### d.      Breach of Express and Implied Warranties

16  Defendant argues plaintiff's warranty claim (Count VIII) should be dismissed on two

17  grounds.  First, plaintiff fails to allege that he attempted to enforce the terms of the warranties at

18  issue.  Second, Young lacks contractual privity because he purchased the LED Bulbs from a non-

19  party, namely Wal-Mart.  The Court addresses each.

20  With respect to the first argument, Cree mischaracterizes plaintiff's warranty claims.  He

21  does not allege that defendant breached the express warranties included on Cree's product

22  packaging.  Rather, he alleges that Cree made representations concerning product life and energy

23

24

25  Second, defendant argues that plaintiff fails to allege detrimental reliance with respect to
26  the negligent misrepresentation claims.  Defendant does not persuade.  Plaintiff alleges that he
relied on defendant's representations regarding the quality and longevity of defendant's LED
27  Bulbs. (*See* CAC ¶¶ 1, 5, 50, 59, 67, 68, 90, 96.)  In any event, an inference of reliance is
appropriate where the alleged misrepresentations are material. *See Vasquez v. Superior Court*, 4
28  Cal.3d 800, 814 (Cal. 1971).

savings which themselves give rise to express warranties regarding the same.  (CAC ¶ 115).[9]

Turning to the second argument, "[u]nder California law, the general rule is that privity of contract is required in an action for breach of either express or implied warranty and that there is no privity between the original seller and a subsequent purchaser who is in no way a party to the original sale." *In re Clorox Consumer Litig.,* 894 F. Supp. 2d 1224, 1236 (N.D. Cal. 2012) (internal quotation marks omitted) (citing *Burr v. Sherwin Williams Co.,* 42 Cal. 2d 682, 695 (Cal. 1954)).  However, a "particularized exception[]" to the privity requirement exists as "when the plaintiff relies on written labels or advertisements of a manufacturer." *Clemens v. DaimlerChrysler Corp.,* 534 F.3d 1017, 1023 (9th Cir. 2008) (citing *Burr,* 42 Cal. 2d 682, 696 (1954); *see also In re Ferrero Litig.* 794 F. Supp. 2d 1107, 1118 (S.D. Cal. 2011).  Here, plaintiff alleges misrepresentations regarding defendant's product packaging, written labels, and advertisements.  (CAC ¶ 2.)  Accordingly, privity of contract is not required.  *See Clemens,* 534 F.3d at 1023.  Defendant's motion to dismiss plaintiff's express and implied warranty claims (Count VIII) is **Denied**.

### 2.    Third Category: 100% Satisfaction Guaranteed

Plaintiff's claims based on the third category of representations arise from allegations that defendant's LED Bulbs "are sold with packaging which indicates . . . '100% Satisfaction Guaranteed.'"  (CAC ¶ 15.)  With respect to this category *Punian* illuminates.  *See Punian v. Gillette Co.,* 2016 WL 1029607, at *6–8 (N.D. Cal. 2016).  There, plaintiffs alleged that defendant's labels, which stated that Duralock Batteries were "GUARANTEED for 10 YEARS in storage[,]" were misleading because they did not disclose possible leakage from the batteries during that period.  *Id.* at *3, 6.  Plaintiff brought numerous claims but in granting defendant's motion to dismiss, the court found that "[i]n California the use of the term 'guarantee' generally creates an express warranty . . . [which] is not a representation that a product has no defects, but rather a promise to repair, replace or refund a failed product."  *Id.* (citing Cal. Civ. Code §

---

[9] Pursuant to Cal. Com. Code § 2313(a), "[a]ny affirmation of fact or promise made by the seller to the buyer which relates to the goods becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise."

United States District Court
Northern District of California

1    1791.2(b); *Hoey v. Sony Elecs. Inc.*, 515 F. Supp. 2d 1099, 1104 (N.D. Cal. 2007)).

2           Similarly, the "100% Satisfaction Guarantee[]" at issue here "is not a representation that a

3    product has no defects, but rather a promise to repair, replace or refund a failed product." *Id.*

4    Young does not allege that Cree failed to "repair, replace or refund a failed product." *Id.* Thus,

5    defendant's motion to dismiss plaintiff's claims based on the "100% Satisfaction Guarantee[]" is

6    **GRANTED** with leave to file an amended complaint to allege, if possible, defendant's failure to

7    "repair, replace or refund a failed product." [10]  *Id.*

8           **C.    Standing**

9           Next, defendant argues that Young lacks standing to pursue claims arises from LED Bulbs

10   that he did not purchase.  The Court does not agree.

11          "[A] Plaintiff may have standing to assert claims for unnamed class members based on

12   products he or she did not purchase so long as the products and alleged misrepresentations are

13   substantially similar." *Brown v. Hain Celestial Grp., Inc.*, 913 F. Supp. 2d 881, 890 (N.D. Cal.

14   2012); *see also Astiana v. Dreyer's Grand Ice Cream, Inc.*, 2012 WL 2990766, at *11 (N.D. Cal.

15   2012) ("the critical inquiry seems to be whether there is sufficient similarity between the products

16   purchased and not purchased").  "The majority of the courts that have carefully analyzed the

17   question hold that a plaintiff may have standing to assert claims for unnamed class members based

18   on products he or she did not purchase so long as the products and alleged misrepresentations are

19   substantially similar." *Miller v. Ghirardelli Chocolate Co.*, 912 F. Supp. 2d 861, 869 (N.D. Cal.

20   2012) (noting that "substantial similarity" could be ascertained by examining "product

21   composition" and "whether the alleged misrepresentations are sufficiently similar across

22   product[s]").

23          Here, plaintiff alleges that he purchased three "100 Watt Standard A-Type" LED Bulbs.

24   (CAC ¶ 32.)  The Court finds that Young has standing to assert claims with regard to two other

25   types of LED Bulbs, namely "Reflector (Flood/Spot)" and "Specialty" Bulbs, because plaintiff

26   alleges substantially similar misrepresentations concerning longevity and cost savings.  (*See* CAC

27   _____

28          [10] At oral argument, plaintiff's counsel seemed to suggest that the representation may be
     circumstantial evidence of other claims. The court takes no position on that argument.

United States District Court
Northern District of California

¶ 17 (identifying the three types of LED light bulbs manufactured by Cree as "Standard A-Type, Reflector (Flood/Spot), and Specialty; ¶¶ 19–21 (alleged misrepresentations for Standard A-Type); ¶¶ 23–24 (alleged misrepresentations for Reflector); ¶ 25 (alleged misrepresentations for Specialty).)  Accordingly, defendant's motion to dismiss on standing grounds is **DENIED.**

### D.   Punitive Damages

Cree argues that plaintiff's request for punitive damages under the CLRA fails because he does not allege that "an officer, director, or managing agent of the corporation . . . consciously disregarded, authorized, or ratified each act of oppression, fraud, or malice." Cal. Civ. Code §§ 3294(b); *see Kanfer v. Pharmacare U.S., Inc.*, 142 F. Supp. 3d 1091, 1108 (S.D. Cal. 2015).  The Court concurs and finds that dismissal of plaintiff's request for punitive damages under the CLRA is appropriate in this case.

Accordingly, defendant's motion is **GRANTED** with regard to plaintiff's request for punitive damages under the CLRA with leave to amend to allege, if possible, that "an officer, director, or managing agent of the corporation . . . consciously disregarded, authorized, or ratified each act of oppression, fraud, or malice" now in accordance with this order or 60 days before the close of discovery with leave of the Court should evidence be discovered to support the allegation. *Id.*

### IV.   CONCLUSION

For the reasons set forth above, the Court hereby **GRANTS IN PART** and **DENIES IN PART** defendant's motion to dismiss as follows:

1.   On the topic of preemption, the Court:

    A.   **GRANTS** defendant's motion to dismiss as to the first category of representations, namely those that reiterate disclosures required to be made on the product's principal display panel or Lighting Facts label.

    B.   **DENIES** as to the second category of representations, namely those that present information regarding comparative energy consumption, energy cost savings, and lifespan.

    C.   **DENIES** as to the third category of representations, namely those that

United States District Court
Northern District of California

present information regarding comparative energy consumption, energy cost savings, and lifespan,  namely those that state that Cree's products are "100% Satisfaction Guaranteed."

2.      With respect to the legal sufficiency of the complaint on the second and third categories of representations, the Court:

    A.      **GRANTS** defendant's motion on the fraud counts, namely Counts I, II, III and V, with leave to amend to plead reliance and the specific representations on which plaintiff relied.

    B.      **GRANTS** defendant's motion on the negligence-based counts, namely Counts VI and IX, with leave to amend regarding whether plaintiff was exposed to "independent personal liability."

    C.      **DENIES** defendant's motion as to Count VII for unjust enrichment.

    D.      **DENIES** defendant's motion as to Count VIII for breach of express and implied warranties with respect to comparative product life and energy savings.  However, the motion as to a claim based on "100% Satisfaction Guaranteed" is **GRANTED** with leave to allege, if possible, defendant's failure to "repair, replace or refund a failed product."

3.      Defendant's motion based on standing is **DENIED**.

4.      Defendant's motion with respect to punitive damages is **GRANTED** with leave to amend now in accordance with this order or 60 days before the close of discovery with leave of the Court should evidence support the allegation.

Plaintiff shall file an amended complaint within 21 days of this Order.  Defendant shall file its response within 21 after plaintiff's filing.

This terminates Docket Nos. 31, 32.

**IT IS SO ORDERED.**

Dated: April 9, 2018

                               **YVONNE GONZALEZ ROGERS**
                            **UNITED STATES DISTRICT COURT JUDGE**

18

**From:**   Al Safarikas [/O=CREE/OU=EXCHANGE ADMINISTRATIVE GROUP
(FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=ASAFARIKAS]

**Sent:**   6/22/2012 2:59:00 PM

**To:**   Neal Hunter [/O=CREE/OU=EXCHANGE ADMINISTRATIVE GROUP
(FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=NHunter]; Scott Schwab [/O=CREE/OU=EXCHANGE ADMINISTRATIVE
GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=Sschwab]; Gerry Negley [/O=CREE/OU=EXCHANGE
ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=GNegley]; Mike Fallon [/O=CREE/OU=EXCHANGE
ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=MFallon]

**CC:**   Greg Merritt [/O=CREE/OU=RTP/cn=Recipients/cn=gmerritt]

**Subject:**   Consumer Feedback

**Attachments:**   LED Combined.xlsx; A Lamps Combined.xlsx; Downlights Combined (CR6 + CR4).xlsx ·

I went through the feedback on THD.com for
- EcoSmart 6 in downlight
- EcoSmart 4 in downlight
- Philips AmbientLED (60W) A19
- EcoSmart "Omni" (60W) A19
- EcoSmart "Sno-Cone" (40W) A19

and counted mentions for particular attributes/features.

First some caveats:
1. These are for "mentions", both postive and negative. The idea being to determint what consumers care about engough to mention in a review.
2. This is a highly biased sample. It contains only people who cared enough to write a review. Most have purchased but not all.

High level conclusions:
The attributes/features mentioned almost universally group into four (4) levels;
1. First and alone is "Color / Light Quality". Always the highest care-about. Some notes. It is clear by reading the context that most consumers do not differentiate in their feedback between light color (CCT) and light quality (CRI). This is not to say they can't see the difference. THEY CAN. They clearly do not know that there is a difference and as such can't express it. Also they tend to confude color and brightness when they refer to high CCT products. They often refer to 5500K light a "bright" even when it is low lumen. I tried to interpret but in fairness the results for brightness are probably skewed upwards was a result.
2. Second group is. "Engery Efficient & Payback, Dimming, Price/Value, Appearance,Brightness", for both downlights and A-Lamps. For downlights add "Installation" and for A-lamps add  "Dispersion/Directionality".
3. Third group is. "Lifetime / no Maintenance, Warm-up / On-Time", for both downlights and A-Lamps. A Look at the chart may indicate that "RFI/Buzz" should be in this categroy, but the EcoSmart "Sno-Cone" (40W) LSG A19 has serious problems with RFI and the results are skewed by people writing and complaining.
4. Fourth group is "Heat, Cold Temperature operation, Mercury / Toxic, Buzz /Sound/RFI, Warranty, Eco / Green". My surprise was about how low the concern or knowledge about toxic mercury presented. Mentions of "Eco/Gree" were about evenly split between people saying that this was a motivation for buying the product and people pointing out the hypocrasy of a product presenting itself as eco and packaged in so much board and plastic.

Lots of other commentary but I do not want to write book in this email. Call if you want to discuss. I put everything on the sharepoint site. This will be a nice secondary source to the consumer survey being conducted now.

--al



EXHIBIT 11
BOEDEKER
Tuesday, March 12, 2019
Reported by:  Elizabeth Borrelli
CSR 7844, CCRR, CLR

## A-Lamps

### A-Lamps Combined

| Color / Light Quality | Energy Efficient & Payback | Dimming | Price / Value | Appearance / weight | Brightness | Heat | Cold Temperature | Dispersion / Omni | Mercury / Toxic | Lifetime / no Maintenance | Warm-up / On Time |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 199 | 78 | 87 | 81 | 48 | 122 | 25 | 7 | 67 | 17 | 42 | 42 |



**Downlights**

| Downlights Combined (CR6 + CR4) | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Color / Light Quality | Engery Efficient & Payback | Dimming | Price / Value | Appearance / Trim | Brightness | Heat | Cold Temperature | Installation | Mercury / Toxic | Lifetime / no Maintenance | Warm-up / On Time | |
| 163 | 81 | 110 | 87 | 76 | 94 | 18 | 1 | 106 | 6 | 40 | 36 | |



# Light Bulbs Survey

## Screening Section

For this survey, we have some questions about light bulbs.  We also have some questions about you and your household to help us make sure we include a variety of people in this study.

## Industry

[MULTI-SELECT.  RESPONDENT SELECTING 'None of these' NOT ALLOWED TO PICK ANY OTHERS]

Please indicate which of the following industries you or a close family member have worked for pay in the past two years.  (Please select all that apply.)

- ☐ Management
- ☐ Business and Financial Operations
- ☐ Computer and Mathematical
- ☐ Architecture and Engineering
- ☐ Life, Physical, and Social Science
- ☐ Community and Social Service
- ☐ Legal
- ☐ Educational Instruction and Library
- ☐ Arts, Design, Entertainment, Sports, and Media
- ☐ Healthcare Practitioners and Technical
- ☐ Healthcare Support
- ☐ Protective Service
- ☐ Food Preparation and Serving Related
- ☐ Building and Grounds Cleaning and Maintenance
- ☐ Personal Care and Service
- ☐ Sales and Related
- ☐ Office and Administrative Support
- ☐ Farming, Fishing, and Forestry
- ☐ Construction and Extraction
- ☐ Installation, Maintenance, and Repair
- ☐ Production
- ☐ Transportation and Material Moving
- ☐ Military Specific
- ☐ Market Research
- ☐ None of the above

**[TERMINATE IF market research is SELECTED]**



EXHIBIT 15

BOEDEKER

Tuesday, March 12, 2019

Reported by   Elizabeth Borrelli
CSR 7844, CCRR, CLR

## Gender

Are you:

Male ......................................................................................... 1
Female ...................................................................................... 2

## Age

What is your age?

UNDER 18...................... 1
18-29 ...................... 2
30-44 ......................... 3
45-59 ........................ 4
60 OR OLDER .............. 5

**[TERMINATE IF BELOW AGE 18]**

## Household Income

The next question is about the total income of YOUR HOUSEHOLD for last calendar year – for the 12 months of 2018. Please include your income PLUS the income of all members living in your household (including cohabiting partners and armed forces members living at home). Please count income BEFORE TAXES and from all sources (such as wages, salaries, tips, net income from a business, interest, dividends, child support, alimony, Social Security, public assistance, pensions, and retirement benefits). What was your total HOUSEHOLD income for the 12 months of 2018?

- o Less than $25,000
- o $25,000 to $34,999
- o $35,000 to $49,999
- o $50,000 to $74,999
- o $75,000 to $99,999
- o $100,000 to $149,999
- o $150,000 or more
- o Prefer not to answer

## State

In which state do you live?

State Pick List [drop-down box of all 50 States +Washington DC in Alphabetical order]

**[Terminate if not in the United States.]**

WE WILL WANT TO TRACK GENDER, AGE, HHI AND REGION DURING THE FIELDING.

## Education

What is the highest level of school you have completed?

- ○ Less than high school
- ○ High school
- ○ Some college
- ○ Bachelor's degree or higher

## Purchase History Section [Do not show in survey]

## General Questions

How much do you agree with the following statements?

1. "I'm always looking for new ideas to improve my home."
2. "I would buy eco-friendly products if they were less expensive"
3. "Technology is moving so fast I don't even bother to try and keep up."

Strongly disagree, Disagree, Neutral, Agree, Strongly Agree

## Lightbulb Purchase

Have you purchased any of the following in the past four years (2015-2018)?  [RANDOMIZE]

- Incandescent light bulbs
- Fluorescent tubes
- Compact fluorescent (CFL) light bulbs
- Halogen bulbs
- LED light bulbs
- Wi-Fi enabled LED light bulbs
- None of the above

[Terminate if no LED]


## Awareness of brands

[MULTI SELECT] [only if respondent selected light bulbs above][in alphabetical order]
Which of the following brands of LED light bulbs have you heard of?

```
3M
Cree
EarthLED
EcoSmart
FEIT
GE
Geobulb
Halco
IKEA
Insignia
OSRAM
Phillips
SunSun
Switch
Sylvania
TCP/TruDim
Utilitech


None of the above
```

[Terminate if "None of the above"]

## Familiarity With Brands

[MULTI SELECT][ [show list of those brands respondents are aware of from previous question]

How familiar are you with each of the following brands of LED light bulbs?

This is a brand I know...

 a lot about / a little about / just heard the name


## Brands Purchased

[MULTI SELECT][ [of those brands respondents are aware of]

Which Brands of LED light bulbs have you purchased in the past four years?

| Brand | Have Purchased | Have Not Purchased |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |


## Decision Role

[MULTI SELECT][List all brands purchased]
For the LED light bulbs you purchased in the past four years please select all that apply.

| Brand | I made the decision myself | I was involved in the decision making | Someone else made the decision |
|---|---|---|---|
| List brands listed as purchased in response to question above |  |  |  |
|  |  |  |  |
|  |  |  |  |


**[TERMINATE IF "SOME ONE ELSE MADE THE DECISION" IS THE ONLY OPTION SELECTED]**

## Conjoint Section

[Randomly assign respondent to the 100 Watt or 60 Watt scenario]

Next, we have a brief exercise to help us learn about your preferences when purchasing LED light bulbs.  We hope you find this exercise interesting.  There are no "right" or "wrong" answers.  We are simply interested in your opinions.

[For 60 Watt: On the following screens you will be presented with different standard A19 / E26 type LED light bulbs, which use 10 Watt but emit as much light as 60 Watt incandescent light bulbs, and the associated prices. Assume that you are purchasing your favorite brand.]

[For 100 Watt: On the following screens you will be presented with different standard A19 / E21 type LED light bulbs, which use 16 Watt but emit as much light as 100 Watt incandescent light bulbs, and the associated prices. Assume that you are purchasing your favorite brand.]

Please indicate which of the given options you would prefer.  After you make your selection, you will see a follow-up question asking if you would purchase that option.

Below is a list of features and terms with definitions to review before starting the exercise.

After you begin the exercise, if you want to see the information again, you can use your mouse to hover over the feature and a pop-up box will provide more information.

| Attribute | Description |
|---|---|
| Wattage | [For 60 Watt: A 10 Watt LED bulb emits as much light as a 60 Watt incandescent bulb.] [For 100 Watt: A 16 Watt LED bulb emits as much light as a 100 Watt incandescent bulb.] |
| Shape | For 60 Watt: A19 For 100 Watt: A21 |
| Socket | For 60 Watt: E26 For 100 Watt: E21 |
| Lumen | Lumen is a measure of the total quantity of visible light emitted by a light bulb. |

| | |
|---|---|
| Color | The color temperature is measured in Kelvin. Lower values like the standard incandescent 2700K produce a more yellow light, higher values like 5000K create a bluer light. |
| Dimmable | The light output of a dimmable light bulb can be regulated, thereby providing more options for lighting a room. |
| Indoor / Outdoor | Some light bulbs have some water resistance, making them suitable for outdoor usage. |
| Warranty | LED light bulbs come with different warranties. Here we offer:<br><br>1.  10 years with original receipt and packaging<br><br>2.  10-year 100% satisfaction guarantee<br><br>3.  Standard 90-day warranty |
| Lifetime | Traditional incandescent light bulbs typically last between 1,000 and 2,000 hours. According to the US Department of Energy and depending on their design and components, some LED light bulbs last five times longer than incandescent light bulbs, others can last up to 25 times longer than incandescent light bulbs.<br><br>Annual energy costs are generally estimated based on usage of 3 hours per day, every day at an average cost of $0.11 per kilowatt hour. |

| | |
|---|---|
| | [For 60 Watt: A 10 watt LED bulb consumes 50 watt energy less than the 60 watt incandescent light bulb it is meant to replace.]<br><br>[For 100 Watt: A 16 watt LED bulb consumes 84 watt energy less than the 100 watt incandescent light bulb it is meant to replace.] |
| Comparison to cheap LED light bulbs | Light bulbs differ in price and quality. Here we offer under certain conditions that the LED light bulb will last six times longer than cheap LED light bulbs. |
| Price | Price per bulb |

*Attributes and Levels for Conjoint Module*

| Attribute | Description |
|---|---|
| Wattage | [60 Watt Replacement, 10 Watt]<br><br>[100 Watt Replacement, 16 Watt] |
| Shape | [For 60 watt: A19]<br><br>[For 100 watt: A21] |
| Socket | For 60 Watt: E26<br><br>For 100 Watt: E21 |
| Color | 1. Daylight (5000K)<br><br>2. Soft white (2700K) |
| Dimmable | 1. Yes<br><br>2. No |
| Indoor / Outdoor | 1. Yes<br><br>2. No |
| Warranty | 1. 10 years with original receipt and packaging, have to pay for shipment<br><br>2. 10-year 100% satisfaction guarantee, redeemable at retailer<br><br>3. Standard 90-day warranty, redeemable at retailer |
| Lifetime | For 60 Watt:<br><br>1. Lasts 4+ years (5,000 hours), with estimated lifetime savings of $27.50 over incandescent bulbs. |

|  | 2. Lasts 13+ years (15,000 hours) with estimated lifetime savings of $82.50 over incandescent bulbs. |
|  | 3. Lasts 22+ years (25,000 hours) with estimated lifetime savings of $137.50 over incandescent bulbs. |
|  | 4. Lasts 31+ years (35,000 hours) with estimated lifetime savings of $192.50 over incandescent bulbs. |
|  | **For 100 Watt:**<br>1. Lasts 4+ years (5,000 hours) with estimated lifetime savings of $46 over incandescent bulbs.<br>2. Lasts 13+ years (15,000 hours) with estimated lifetime savings of $138 over incandescent bulbs.<br>3. Lasts 22+ years (25,000 hours) with estimated lifetime savings of $230 over incandescent bulbs.<br>4. Lasts 31+ years (35,000 hours) with estimated lifetime savings of $321.50 over incandescent bulbs. |
| Comparison to cheap LED light bulbs | 1. The LED light bulb will last six times longer than cheap LED light bulbs.<br>2. No claim  [blank] |
| Price per bulb | For 60 watt replacement:<br>1. $3.99<br>2. $5.99 |

| | |
|---|---|
| | 3.  $7.99 |
| | 4.  $9.99 |
| | 5.  $11.99 |
| | |
| | For 100 watt replacement: |
| | 1.  5.99 |
| | 2.  7.99 |
| | 3.  9.99 |
| | 4.  11.99 |
| | 5.  13.99 |

*The Conjoint Module*

Please indicate which of the given options you would select.

| | Option | | | | |
|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 |
| Attribute 1 | | | | | |
| Attribute 2 | | | | | |
| Attribute 3 | | | | | |
| Attribute 4 | | | | | |
| Attribute 5 | | | | | |
| Price | | | | | |
| Which option would you prefer? | | | | | |

[randomize all but price and "which option would you prefer?"]

Would you purchase the option you selected above?

- o   Yes

- o   No

**[CONJOINT DESIGN MATRIX AND BETTER EXAMPLE TO BE PROVIDED IN SEPARATE EXCEL FILE.]**

## Closing

### Understanding

Did you have a clear understanding of the questions in this survey?

- ○ Yes [SKIP TO LAST QUESTION]
- ○ No [ASK NEXT QUESTION]

Which part was not understandable?

### Comments

Do you have any additional comments?


Thank you for your help and contribution today. We very much appreciate your participation in our research study.