1

2

3

4

5

6

7

8

9

10

11

12

13

14

United States District Court
Northern District of California

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

|  |  |
|---|---|
| **JEFF YOUNG,** | Case No. 4:17-cv-06252-YGR |
| Plaintiff, | |
| v. | **ORDER: (1) GRANTING MOTION TO STRIKE AND EXCLUDE DR. GARY ALLEN; (2) DENYING AS MOOT MOTION TO STRIKE AND EXCLUDE MR. STEFAN BOEDEKER; (3) DENYING RENEWED MOTION TO CERTIFY CLASS** |
| **CREE INC.,** | |
| Defendant. | |
|  | Re: Dkt. Nos. 115, 116, 117, 118, 127 |

Plaintiff Jeff Young brings this putative class action lawsuit against defendant Cree, Inc. alleging that Cree engaged in an "unfair and deceptive practice of . . . promising consumers" that Cree's light-emitting-diode ("LED") bulbs "will last for particularly long periods of time up to 35,000 hours" with a "100% Satisfaction Guarantee" and "yearly energy cost savings ranging from around $0.60 to $2 per blub per year" in violation of California's Unfair Competition Law ("UCL"), Cal. Bus. Prof. Code §§ 17200, *et seq.* (Count I); California's False Advertising Law ("FAL"), Cal. Bus. Prof. Code §§ 17500, *et seq.* (Count II); Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1750, *et seq.* (Count III); fraudulent misrepresentation and concealment (Count IV); unjust enrichment (Count V); and breach of express and implied warranties (Count VI). (Dkt. No. 48, Amended Class Action Complaint ("ACAC").)

Now before the Court are the following motions: (1) Young's renewed motion for class certification (Dkt. No. 116); (2) Cree's motion to strike the report and exclude opinions of Dr. Stefan Boedeker (Dkt. No. 117); and (3) Cree's motion to strike the report and exclude opinions of Dr. Gary Allen. (Dkt. No. 118.)

Having carefully considered the pleadings and the papers submitted, as well as oral argument from counsel on July 28, 2020, and for the reasons set forth more fully below, the Court **HEREBY ORDERS** as follows: (1) Young's motion for class certification is **DENIED**; (2) Cree's motion to strike the report and exclude opinions of Dr. Stefan Boedeker is **DENIED AS MOOT**; and (3) Cree's motion to strike the report and exclude opinions of Dr. Gary Allen is **GRANTED**.

I. **BACKGROUND**[1]

   A. **Factual Background**[2]

The record evidence reveals the following:

Cree is a manufacturer of LEDs and lighting products.  Cree launched its line of consumer LED lightbulbs in 2013, and includes several different varieties, including A-type, reflector, downlight, surface and disk mount, and candelabra bulbs.  Each bulb type has variations for different features, wattages, color temperatures and sizes, which affect a bulb's thermal properties.[3]  Despite these differences, Cree believes its LED bulbs are a "premium product" as opposed to a "high-volume average run-of-the-mill product."

In general, LED bulb consumers have been driven, in part, to these products because the overall value of the purchase driven by claims relating to a LED bulb's extended lifetime or energy efficiency savings.  Indeed, studies in the record have confirmed that such consumers are primarily driven by these longevity and cost saving claims based on energy efficiency.

---

[1]  In conjunction with their motion for class certification and reply in support thereof, Young has filed two Administrative Motions to Seal.  (Dkt. Nos. 115, 127.)  Both motions are "brought solely pursuant to Rule 79-5(e)" based on material designated by defendant as confidential or privileged.  (Dkt. Nos. 115 at 2; 127 at 2.)  Because Cree, as the designating party, has failed to file a declaration establishing that all of the designated material is sealable, as required by Rule 79-5(e)(1), the Court **DENIES** Young's administrative motions to seal.

[2]  The Court omits record citations in this section to expedite the issuance of this Order.

[3]  Young avers, citing to his expert witness Dr. Allen, that "[c]osmetic differences in the shape, color, size, or wattage of the LED Lightbulbs have no bearing in the analysis as to the class-wide treatment of Cree's uniform statements regarding longevity."  (Dkt. No. 115-4 at 11.)  Moreover, Dr. Allen contends that the Cree LED bulbs designs permit him to perform a class-wide assessment to find defects common to the products at issue. The Court discusses these points in the relevant section below.

United States District Court
Northern District of California

United States District Court
Northern District of California

Federal law and regulation control testing and, in part, information conveyed to consumers. First, each of Cree's lines of bulbs was certified as energy efficient under the federal government's ENERGY STAR program, which requires each bulb to pass industry-standard tests.  Second, ENERGY STAR guidelines require manufacturers to include certain information on the bulb itself and the bulb's packaging and advertising materials, including a standardized "Lighting Facts" box which requires, among other things: (i) the bulb's initial light output; (ii) estimated annual energy costs in dollars calculated using the average initial wattage, a usage rate of three hours per day, and $0.11 per kWH; (iii) the life of the lamp express in years, calculated by using the bulb's L70[4] lifetime in hours and assuming operation of three hours a day; and (iv) the wattage for each lamp expressed as "Energy Used" in average initial wattage.

There is some uniformity in the marketing and labeling of the products but the packaging for each of its LED bulb products are not singular.  Although each iteration of Cree's bulb packaging contains the mandatory Lighting Facts box, each product line of Cree's bulbs has its own distinct packaging with different images and statements, which changed throughout the proposed class period even within each line of bulbs.  Notably, no single iteration of Cree's LED bulb packaging contained all the statements Young identifies below as problematic in the renewed motion for class certification.

Young and the proposed class highlight several claims which they assert are on every LED lightbulb at issue: (1) energy and cost savings, such as "82% Less Energy Consumption" and "$226 Lifetime Energy savings"; (2) longevity and performance comparisons to other LED bulbs, such as "Our LED bulbs work better and last longer"; and (3) "100% Satisfaction Guarantee." Young also points out that Cree's non-labeling marketing strategy reinforces these claims, with statements including:

- "[S]ave money now and save money later" by purchasing the "100-watt
  Cree LED bulb [that] looks and lights like a traditional incandescent bulb,

---

[4]  "L70" is the number of hours of operation after which a bulb can be expected to emit at least 70% of its initial light output, which Cree avers that the industry considers this metric the end of an LED bulb's useful life.

United States District Court
Northern District of California

but uses 82% less energy and is designed to last 25 times longer."

- The bulbs "look and light like an incandescent, while using up to 85% less energy and lasting 25 times longer," which are "Built to light and last. Covered by Cree's industry leading 10-year limited warranty."

- "Unlike some others, Cree doesn't compromise"

- "Long LED lifetime lasts 22+ years (25,000 hours), up to 2x as long as the cheap LED bulbs."

- With respect to its BR40 85W Replacement LED lightbulbs: "Longer LED lifetime lasts 22+ years (25,000 hours), up to 6x as long as the cheap LED bulbs."

Cree has some influence over the pricing of its products through a Manufacturer's Suggested Retail Price ("MSRP"), but has no further control as to the actual retail pricing of its products. The Home Depot ("THD") was the exclusive retailer of Cree's products when Cree began selling its consumer bulbs in 2013. Today, however, while THD accounts for a significant portion of its retail sales (approximately 85%), Cree also sells some bulbs through Amazon.com and specialty lighting website 1000bulbs.com. At these retailers, Cree has no control over whether these entities place its products on sale or clearance, or on how THD merchandises its bulbs within stores. Furthermore, the pricing of Cree consumer bulbs varies from line to line, though, pricing of all of its consumer bulbs has generally decreased over time. The pricing of each product can also be affected by the sale of multipack of bulbs, and rebates offered by various utility companies.

For each of Cree's lines of bulbs, Cree has implemented multiple generational changes between 2013 and today. As a result of Cree's manufacturing improvements and generational changes, bulbs within the same product line may be from different generations, and bulbs within the same generation may have been manufactured using different processes or components. Retailers do not keep track of generational changes in bulbs, so there is no way to track which generation of bulb each consumer purchased. As retailers control the sale of and stocking of Cree products, consumers may see on the same day different generations of Cree products or packaging.

4

Cree highlights that consumers may ultimately use the bulbs differently.  For instance, consumers may be using bulbs in a manner that is contrary to a bulb's instructions and warnings.  Moreover, consumers may also be selling bulbs on the "gray market"—buying large quantities of bulbs and reselling them online for profit.

Cree has also offered consumers various warranties since 2013, the length and terms of which have changed over time and varies from product line to product line.  Those bulbs purchased from THD can return the products to THD subject to their return policy or initiate a warranty claim directly to Cree.  Since 2013, Cree's return and warranty claim rates have both been less than 2%, which Cree asserts is very low by industry standards.  Although the specific warranties may have changed, Cree's customer service department has followed a "satisfaction guaranteed" policy and offers replacement bulbs to dissatisfied customers even if they do not comply with or fall within the warranty terms.

To Cree's knowledge, it is not aware of any product of manufacturing defects that affect the expected lifetime of its consumer bulbs, nor has it been the subject of what it defines as unusually high consumer complaints or warranty returns.  In short, Cree avers that its consumer bulbs have never experienced catastrophic failure at an unusually high rate.

With regards to Young specifically: In April 2015, Young purchased three 100W replacement dimmable LED lightbulbs from a THD store in Windsor, California, paying approximately $15 to $20 per bulb.  Young avers that he reviewed the represents on the label, including those about longevity, cost savings, and warranty, and further recalls viewing television advertisements containing longevity representations.  Young inserted these bulbs into his wall sconces, where they burned out within six months to a year of use.  In August 2016, Young emailed Cree regarding the failed LED bulbs, but never received a response.

Based on the foregoing, Young and the proposed class assert that they paid a premium because of these allegedly false, deceptive and misleading marketing representations regarding longevity.  As alleged in the operative complaint, Cree LED "failed well before the promised time frame."  (ACAC ¶ 34.)

1

**B.      Procedural Background**

2           The parties had previously engaged in briefing on class certification and related *Daubert*

3    motions.  (*See* Dkt. Nos. 79, 85, 93.)  On May 28, 2019, the Court heard oral argument on these

4    motions.  (*See* Dkt. No 107.)  The following day, for reasons stated on the record at the oral

5    argument, the Court denied without prejudice the motion for class certification, and denied as

6    moot the pending *Daubert* motions.  (*See* Dkt. No. 109.)  The Court thereafter set a briefing

7    schedule on this round of briefing (*see* Dkt. No. 113), which was later modified due to the onset

8    and continuation of the ongoing coronavirus (COVID-19) pandemic.  (*See* Dkt. No. 124.)

9           Young now seeks in his renewed motion to certify the following class: "All persons in

10   California who purchased Cree LED Lightbulbs for end use, and not resale, during the period from

11   March 2013 to the present (the "Class")."  (Dkt. No. 116 at 9-10.)  Cree's opposition contends that

12   Young's claims fail to satisfy commonality, typicality, and adequacy of representation, in addition

13   to the requirements under section (b)(3).  (*See generally* Dkt. No. 119.)  In support of this motion,

14   Young provides two expert reports: first, a report of expert Dr. Stefan Boedeker, who Young hired

15   to "ascertain if it is possible to quantify economic losses to [p]laintiff and [putative] class

16   members" and "provide a framework for the computation of class-wide damages" (Dkt. No. 115-

17   18 (opening report), ¶ 14; *see also* Dkt. No. 116-2 at 9-170 (rebuttal report)); second, a report of

18   expert Dr. Gary R. Allen, who Young hired "to determine whether a common failure mode exists

19   for a discrete set of LED lamps[.]"  (Dkt. No. 115-17 ("Allen Report"), ¶ 2; *see also* Dkt. No. 126-

20   1 at 3-51 ("Allen Rebuttal").)  Cree seeks to strike the reports of and exclude opinions of Young's

21   expert witnesses, Boedeker and Allen.  (Dkt. Nos. 117, 118.)

22   **II.    LEGAL FRAMEWORK**

23          **A.      *Daubert* Motion Standard**

24          Federal Rule of Evidence 702 permits opinion testimony by an expert as long as the

25   witness is qualified and their opinion is relevant and reliable.  An expert witness may be qualified

26   by "knowledge, skill, experience, training, or education."  Fed. R. Evid. 702. The proponent of

27   expert testimony has the burden of proving admissibility in accordance with Rule 702.  Fed. R.

28   Evid. 702, Advisory Committee Notes (2000 amendments).  An expert should be permitted to

United States District Court
Northern District of California

testify if the proponent demonstrates that: (i) the expert is qualified; (ii) the evidence is relevant to the suit; and (iii) the evidence is reliable.  *See Thompson v. Whirlpool Corp.*, 2008 WL 2063549, at *3 (W.D. Wash. 2008) (citing *Daubert v, Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589-90 (1993) (*Daubert I*)).  Moreover, at the class certification stage, the Court does not make an ultimate determination of the admissibility of an expert's opinions for purposes of a dispositive motion or trial.  *Dukes v. Wal–Mart Stores, Inc.* (*Dukes II*), 603 F.3d 571, 602 n. 22 (9th Cir. 2010) *rev'd on other grounds* by 564 U.S. 338 (2011); *Millenkamp v. Davisco Foods Int'l, Inc.*, 562 F.3d 971, 979 (9th Cir. 2009).  Rather, the court considers only whether the expert evidence is "useful in evaluating whether class certification requirements have been met." *Tait v. BSH Home Appliances Corp.*, 289 F.R.D. 466, 495–96 (C.D. Cal. 2012) (citing *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir. 2011)); *see also Rai v. Santa Clara Valley Trans.*, 308 F.R.D. 245, 264 (N.D. Cal. 2015).  At class certification, "the relevant inquiry is a tailored *Daubert* analysis which scrutinizes the reliability of the expert testimony in light of the criteria for class certification and the current state of the evidence." *Id*.  For scientific opinions, they must be based on scientifically valid principles.  *Daubert I*, 509 U.S. at 589.

     **B.**      **Motion for Class Certification**

Under Federal Rule of Civil Procedure 23(a), a court may certify a class only where "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a).  Courts refer to these four requirements as "numerosity, commonality, typicality[,] and adequacy of representation." *Mazza v. Am. Honda Motor Co., Inc.*, 666 F.3d 581, 588 (9th Cir. 2012).

Once the threshold requirements of Rule 23(a) are met, plaintiffs must then show "through evidentiary proof" that a class is appropriate for certification under one of the provisions in Rule 23(b).  *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013).  Here, plaintiff seeks certification under Rule 23(b)(2) and Rule 23(b)(3).  Rule 23(b)(3) requires a plaintiff to establish "that the questions of law or fact common to class members predominate over any questions affecting only

*United States District Court*
*Northern District of California*

individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  The predominance inquiry focuses on "whether proposed classes are sufficiently cohesive to warrant adjudication by representation."  *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1022 (9th Cir. 1998) (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997)).

"[A] court's class-certification analysis must be 'rigorous' and may 'entail some overlap with the merits of the plaintiff's underlying claim.'"  *Amgen, Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 456-66 (2013) (quoting *Wal-Mart Store, Inc. v. Dukes*, 564 U.S. 338, 351 (2011) (*Dukes*)); *see also Mazza*, 666 F.3d at 588.  The Court considers the merits to the extent they overlap with the Rule 23 requirements.  *Ellis*, 657 F.3d at 983.  The Court must resolve factual disputes as "necessary to determine whether there was a common pattern and practice that could affect the class *as a whole*."  *Id.* (emphasis in original).  When resolving such factual disputes in the context of a motion for class certification, district courts must consider "the persuasiveness of the evidence presented."  *Ellis*, 657 F.3d at 982.  "A party seeking class certification must affirmatively demonstrate [its] compliance with the Rule."  *Dukes*, 564 U.S. at 350.  Ultimately, the Court exercises its discretion to determine whether a class should be certified.  *Califano v. Yamasaki*, 442 U.S. 682, 703 (1979).

## III.    ANALYSIS

The Court first address the pending *Daubert* motion regarding Dr. Allen given its importance for the underlying motion for class certification.  For the reasons set forth below, the Court finds that the *Daubert* motion as to Dr. Allen is well-taken and that its exclusion from the class certification analysis is fatal to the request to certify the class.  Consequently, the Court declines to rule on the *Daubert* motion as to Dr. Boedeker as the issue is moot.

### A.    *Daubert* Motion as to Dr. Allen

Young primarily relies on Dr. Allen to identify alleged defects that are common to the architecture of the Cree LED lightbulbs in order to support his burden of the commonality factor under Rule 23(a) and the predominance inquiry under Rule 23(b)(3).  Cree does not challenge Dr. Allen's credentials, experience, or his background.  Instead, Cree focuses on his evaluations and

1    assessments, including as to the procedures, assumptions and ultimate opinions. The Court

2    summarizes his background and the relevant substance of both his opening and rebuttal reports, as

3    well as other relevant evidence in the record, before analyzing his reports under the *Daubert*

4    standard.

5             *1.       Relevant Background and Summary*

6             Dr. Allen has a Ph.D. and a Masters of Science in astrophysical sciences from Princeton

7    University and in addition to degrees from Pennsylvania State University. (Allen Report ¶ 5.) Dr.

8    Allen conceived and designed the world's first LED replacement lamp to be certified under the

9    ENERGY STAR program. (*Id.* ¶ 4.) As described in depth in his report, he has decades of

10   experience with research and industrial institutions in the fields of lighting, applied physics,

11   product design, and patent generation and analysis as the principal engineer and engineering

12   manager of GE Lighting and as a research physicist with Sylvania Lighting. (*Id.* ¶¶ 6-10.) Dr.

13   Allen has primarily been an expert witness in patent infringement cases, but has also testified as an

14   expert witness in a breach of a non-disclosure agreement matter. (*Id.* ¶ 1.)

15            As disclosed in his expert report, Dr. Allen was hired "to determine whether a common

16   failure mode exists for a discrete set of LED lamps[,]"[5] which he identifies as thirty Cree LED

17   bulbs.[6] (*Id.* ¶ 2.)

18            While Dr. Allen's report is quite technical, his fundamental methodology is quite

19   simplistic. To conduct his analysis, Dr. Allen grouped together similar Cree LED bulbs, tested a

20

21            [5] Dr. Allen utilizes the term "lamp" in its technical meaning used in the lighting
22   manufacture industry which defines "lamp" as "a self-contained light source powered by
     electricity and producing light" which is "equivalent to what is commonly called a "light bulb."
23   (*Id.* ¶ 12.) Dr. Allen further clarifies that he defines an "LED lamp" as a lamp whose light is
     produced by an LED in contrast to an LED which "is generally contained inside the [l]amp." (*Id.*)
24   Dr. Allen also defines "fixture" as "hardware that holds the [l]amp in place in its application,"
     more commonly recognized as a "table lamp, floor lamp, desk lamp, etc. having an Edison-style
25   socket that the lamp screws into [sic]." (*Id.*) The Court provides these defined terms to clarify
     quoted sections from Dr. Allen's report. This Order uses the term "bulb" or "lightbulb" and
26   "lamp" interchangeably unless otherwise noted.

27            [6] Dr. Allen clarifies that his opinions only extend insofar as those lamps listed in Table 2
     of his opening report. (*See* Allen Rebuttal ¶¶ 1 n.1, 18.) Cree notes that it makes more LED
28   lamps than those identified in this table. (*See* Dkt. No. 132-2 ("Vollers II Decl.") ¶ 59.)

United States District Court
Northern District of California

fraction of them, and then extrapolated his conclusions across a wide array of Cree products. Thus, Dr. Allen reviewed the packaging of 43 types of LED bulbs sold during the class period, and sorted them by manufacturer part number.  (*Id.* ¶ 12.)  Next, he narrowed the 43 bulbs down to 30 on the ground that each of the 30 provided either a 5- or 10-year warranty and had some type of claimed lifetime energy savings.  (*Id.*)

Dr. Allen then grouped the 30 by focusing on the design elements related to reliability and useful life of the product in consumer applications.  (*Id.*)  From this grouping, Dr. Allen concluded that many of these designs were "functionally equivalent" designs that share the following attributes: bulb shape, lamp architecture, lumens, wattage equivalent, LED wattage, and rated lifetime.  (*Id.* ¶ 14.)  Dr. Allen first categorized the 30 Cree LED bulbs into seven "Cree LED Lamp Designs."  (*Id.*)  Thereafter, Dr. Allen further narrowed the groupings into four "LED Lamp Design Architectures" "based on their fundamental design architecture and visual appearance": (1) the FT21 Design Architecture; (2) the FT19 Design Architecture; (3) the 4F19 Design Architecture; and (4) the BRHS Design Architecture.  (*Id.* ¶ 15.)[7]  Notably, Dr. Allen's categorizations were not based on any physically inspection of even a single Cree LED lamp, but rather resulted from reviewing photographs or PDF images.  (*Id.* ¶¶ 12-16; Dkt. No. 120-10 (Richter Decl. Ex. 10) ("Allen Dep.") at 40:18-42:14.)[8]

Dr. Allen then moved into a testing phase.  He purchased approximately ten Cree LED bulbs from third-party internet sellers,[9] which he contends are representative of the seven LED

---

[7]  Dr. Allen notes that at the time of his opening report, two of the seven Cree LED Lamp Designs, the FT18 and the FT9.0, were not commercially available.  (*Id.* at ¶ 16.)  Dr. Allen noted that the FT18 is functionally equivalent to a FT18/3w (3-way lamp) that is functionally equivalent when operating on the 100 W setting.  (*Id.*)  For the FT9.0, Dr. Allen notes there is a FT9.5 that has 0.5W difference in operating power, which he discounts in his later analysis.  (*Id.*)

[8]  The use of photographs and the narrowing of designs into design groups and then further into architecture design groups are neither an industry standard or industry practice, nor is it based upon any peer reviewed or generally scientific or technical principles.  (*See* Allen Report ¶¶ 12-16; Allen Dep. at 41:5-42:14; Dkt. No. 119-2 ("Vollers I Decl.") ¶¶ 18, 20.)

[9]  Dr. Allen provides no evidence on the storage conditions of the LED lamps prior to purchase, nor is he aware of whether these lamps were used previously, although he testified that these LED lamps were in the original packaging at the time of purchase.  (Allen Dep. at 58:3-

United States District Court
Northern District of California

United States District Court
Northern District of California

Lamp Design and four LED Lamp Design Architectures.  The ten Cree LED bulbs represent five of the seven identified Cree LED Lamp Designs, specifically: four FT19 lamps (two from the FT9.5 Lamp Design, and two from the FT6 Lamp Design), two FT21 lamps (FT18/3w Lamp Design), two 4F19 lamps (4F10 Lamp Design), and two BRHS lamps (BR30 Lamp Design), all manufactured in different years from 2013 to 2016.  (Allen Report ¶¶ 3, 15, 16, 42 (Table 6).)   Dr. Allen did not take into consideration the various generations of each Lamp Architecture, and instead focused solely on samples from only one or two manufacturing weeks in 2013 and 2016.  (Allen Dep. at 44:18-45:14; 88:12-89:6.)

Dr. Allen subjected these ten bulb samples to: (1) a visual inspection of the LED bulbs; (2) temperature measurement and testing; and (3) a comparison to market competitors to corroborate the results of his testing.  (Allen Report ¶¶ 12-16, 17, 62-69.)  In considering the data generated by his tests, he compared his own data with Cree's internal laboratory test results, including those showing temperature data.  (*Id.* ¶ 20.)

With respect to the thermal tests, Dr. Allen took infrared images and temperature measurements of certain basic components and subsystems that are found in all LED lamps, including the LEDs themselves, drivers, electrolytic capacitors, heat sink, and the envelope or optics.  (*Id.* ¶¶ 17-19.)  Specifically, Dr. Allen dissembled one of the two LED lamps that he purchased for each available Lamp Design, and recorded temperature measurements on LED lamps operating for approximately 2.5 hours at: (i) the heat sink; (ii) electrolytic capacitor; and (iii) the printed circuit board ("PCB"), upon which the LEDs are soldered.  (*Id.* ¶ 42.)  Dr. Allen performed these measurements in 25° C (75° F) ambient air, and thereafter extrapolated those temperatures to expected performance at 45° C (113° F) ambient air.  (*Id.* ¶¶ 41-46.)  During his deposition, Dr. Allen conceded that to adequately test the expected lifetime of Cree LED lamps, he would have needed to perform extended reliability testing on a large number of Cree LED lamps.  (Allen Dep. at 18:6-15.)  He did not do; nor did he explain why.  Importantly, Dr. Allen's report did not reveal that any of the Cree LED lamps that he tested catastrophically failed during his

_____

59:11.)

1  inspection.[10]

2       Instead, Dr. Allen merely created a purported "methodology" to compare the temperature

3  measurements recorded after 2.5 hours of use to what he refers to as a "Target Maximum." This

4  purported methodology was specifically developed for this litigation and is not based on any

5  industry standard, peer-reviewed analysis, or generally accepted scientific or technical principles.

6  (Allen Report ¶¶ 22, 23; Allen Dep. at 111:24-112:13.)

7       By way of background, in the lighting industry, component manufacturers typically

8  publish specification sheets that state the maximum operating temperature at which the component

9  should operate in order to achieve a target lifetime. (Vollers I Decl. ¶¶ 35-39.) Dr. Allen's Target

10 Maximums are as much as 20° C, or 68° F, *below* the rated temperature for these components.

11 (Allen Report ¶¶ 42-45.) The "Target Maximums" are based solely on Dr. Allen's own

12 conservative, personal design opinions for good guidelines. He concedes that no publication or

13 source reflects any maximum temperature threshold. (Allen Report ¶¶ 22, 23; Allen Dep. at

14 111:24-112:13.)[11]

15      Dr. Allen concluded, based on the foregoing categorizations and temperature analyses that,

16 despite cosmetic variation, all the LED bulbs run "too hot" which stresses the electronic

17 components beyond what they can handle and results in premature "failures" and shortened

18  _____

19      [10] The parties briefing and the record reflects that there are generally two types of failures: the first, catastrophic failure, is where the LED lamp fails completely. The second, parametric

20 failure, includes LED lamp failure on other metrics, including lumen depreciation, color shift, and flicker. Importantly, Dr. Allen does not provide a methodology to evaluate LED lamps for

21 failures on a class wide basis, and concedes that some people may have increased ability to visually detect flicker in lights than others. (*See* Allen Rebuttal ¶ 80; Vollers II Decl. ¶ 71.)

22      [11] For example: Dr. Allen opines that he believes the LED junction temperature, which is

23 measured at the PCB onto which the LEDs are soldered, should not exceed 105° C for Cree LED lamps, despite that the LEDs used in the evaluated lamps are rated to exceed 25,000-hour

24 ENERGY STAR requirements at 125° C. (Allen Report ¶ 26.) As for the electrolytic capacitor, Dr. Allen selected either 72° C or 82° C as the Target Maximum even though these capacitors that

25 were evaluated have a 25,000 hour rated lifetime at 92° C. (Allen Report ¶ 27; Dkt. No. 132-1 ("Fang II Decl.") ¶¶ 17-18.) For the heat sink, Dr. Allen noted that there is no industry standard

26 for the maximum operating temperature of a heat sink, but that he adopted a "personal guideline" to strive to keep the heat sink temperature below 75° C in order to keep the "touch point," or

27 temperature of the exterior of an operating bulb, sufficiently low, for the sole purpose of ensuring that a consumer can comfortably touch the lamp's exterior. (Allen Report ¶ 28.) How touch is

28 relevant is never made clear.

United States District Court
Northern District of California

1   lifespans.  (Allen Report ¶¶ 3, 24, 42 & Table 6.)  Specifically, Dr. Allen concluded that some of

2   the Cree LED lamps would exceed the Target Maximums when operated at 25° C (75° F), and

3   many more would exceed his Target Maximums when he extrapolated measurements to 45° C

4   (113° F).  (*Id.* ¶¶ 3, 43-46.)

5         Utilizing these measurements, Dr. Allen calculated the difference between the expected

6   lifetime of a Cree LED lamp and his conservative target design that would have used his Target

7   Maximums by applying what he refers to as a "Rule of Thumb," namely "a[n operating]

8   temperature increase of 10C is generally accepted as cutting the life of [an electronic component

9   in half."  (*Id.* ¶ 22.)  In applying this rule of thumb, Dr. Allen focused particular attention on the

10  electrolytic capacitor, and opined that the operating temperature of Cree LED lamps would cause

11  the electrolytic capacitors to fail prematurely.  (*Id.* ¶ 46.)  Dr. Allen found that the premature

12  failure is so significant that the LED bulbs will "commonly experience failure in advance of the

13  advertised product life ([less than one] year)" with a "failure rate [that] would be abnormally

14  high."  (*Id.* ¶ 3; Allen Dep. at 19:17-18.)[12]

15        While Dr. Allen found that Cree LED bulbs would commonly experience failure within

16  one year, Dr. Allen's report has noteworthy caveats.  First, Dr. Allen could not quantify the

17  number or percentage of Cree LED Lamps that would, in his opinion, fail in less than one year.

18  (*Id.* at 17:25-18:20, 22:5-17.)  Indeed, while Dr. Allen avers that his report confirms that there is a

19  defect, his report assumes an inference that Cree LED lamps are defective based on the allegations

20  of this lawsuit.  (*Id.* at 83:19-84:24.)  Second, Dr. Allen did not reconcile or address Cree's own

21  reliability testing results, reflecting that Cree LED lamps perform within stated temperature

22  tolerances and are not expected to commonly experience premature failures.  (*Id.* at 78:4-79:12.)[13]

23

24      [12]  Although Dr. Allen does not elaborate in his report what "failure" the defect causes, the

25  record reflects that, in general: (1) an LED failure would mean that an LED lamp would emit less
    light, or color shift, which means that the color temperature of the Lamp may shift warmer
    (Vollers I Decl. ¶ 57); and (2) a failure of the electrolytic capacitor would result in a flicker that

26  most, but not all, humans cannot perceive.  (Dkt. No. 119-4 ("Fang I Decl.") ¶¶ 21-24.)  Dr. Allen
    did testify in his deposition that higher temperatures of the electrolytic capacitor "would mean

27  higher stress on [it], and likely a shorten lifetime."  (Allen Dep. at 107:1-3.)

28      [13] Dr. Allen did not address the evidence reflecting a low return and warranty claim rate on
    Cree LED lamps.  (*Id.* at 20:9-21:9; 91:25-92:8; 96:5-97:3.)

Finally, in Dr. Allen's rebuttal report, he introduces additional arguments in support of his opening report, including: (1) citing to a new methodology and studies that subject LED lamps to on-off switching that Dr. Allen avers proves that Cree LED lamps will fail prematurely; and (2) performed statistical analysis of THD's records of returned Cree LED lamps.  (Allen Rebuttal ¶¶ 38-44, 76-77.)  Further, Dr. Allen withdrew two lamp types set as defective from his analysis: specifically, Dr. Allen states that he "did a separate thermal analysis of the 40 W and 60 W version of the FT19 and found that the 40 W version" – which Dr. Allen refers to as the FT6.0 lamp type – "is not overheated enough for [him] to opine that it will fail prematurely."  (*Id.* ¶¶ 21, 78; *see also* Vollers II Decl. ¶ 64 (noting Dr. Allen's err in assuming similar thermal problems with different wattage LED lamps.).)  Additionally, Dr. Allen clarified that although he included the lamp type FT9.0 in his FT19 Lamp Architecture Group, he does not actually have an opinion about that lamp, stating: "There are no Opinions provided  for the FT9.0 because there are no samples available for procurement of that LED Lamp."  (Allen Rebuttal ¶ 64.)

### 2.    *Analysis*

Cree challenges two of Dr. Allen's methodologies and assessments made in his opinions:[14] (a) the LED Lamp Design and LED Lamp Design Architecture methodology and classification; and (b) the Target Maximum methodology and conclusions.  Cree further moves to strike new opinions and methodologies that were absent in Dr. Allen's Rebuttal, namely: (i) Dr. Allen's citations to new methodology and studies that subject LED lamps to on-off switching that he claims proves Cree LED lamps will fail premature; and (ii) Dr. Allen's purported statistical analysis of the THD's records of returned Cree LED lamps.  The Court addresses each in turn.[15]

---

[14] Cree does not challenge Dr. Allen's credentials.  Dr. Allen is a well-credentialed, knowledgeable, and experienced individual in the area of LED lamp design.

[15]  As an initial matter, Young seeks to exclude declarations from Jonathan Vollers and Yuan Frank Fang on the basis that Cree did not attempt to qualify them or submit their testimony as experts.  With respect to Vollers, the Court **DENIES** this request where Young did not object to Vollers earlier declaration during the briefing on the first motion for class certification (*see* Dkt. No. 86-3), and, being on notice of the same, has not shown any prejudice or denial of a deposition. With respect to Fang, the Court **DENIES AS MOOT** this request, where Fang's declarations do not materially impact the Court's analysis, and citations to Fang's declarations otherwise are in addition to citations from other sources in the record.

United States District Court
Northern District of California

United States District Court
Northern District of California

a.     LED Lamp Design and LED Lamp Design Architecture

With respect to the LED Lamp Design and LED Lamp Design Architecture methodology and classification, Cree argues that Dr. Allen's analysis is not based on any accepted methodology and was solely created for purposes of this litigation.  Young disagrees claiming that Dr. Allen's categorization is based on solid engineering principles and does not need to be based on a peer-reviewed methodology.

To determine whether a scientific opinion is sufficiently reliable to be admissible, the Court must "analyze not what the expert[s] say[]s, but what basis they have for saying it." *Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1216 (9th Cir. 1995) (*Daubert II*).  Scientific methodology can be reliable if: (i) the methodology can and has been tested; (ii) the methodology has been subjected to peer review; (iii) the known or potential rate of error for the technique has been addressed; or (iv) the methodology has a general degree of acceptance in the relevant scientific community.  *Daubert I*, 509 U.S. 593-94.  An expert must "employ[] in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999).  In some situations, "[p]eer reviewed scientific literature may be unavailable because the issue may be too particular, new, or of insufficiently broad interest to be in the literature." *Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010).  In those circumstances, expert opinion testimony "is reliable if the knowledge underlying it has a reliable basis in the knowledge and experience of the relevant discipline." *Id.*  Of course, evaluating the design and predicting the lifetime of an electrical system is, however, a scientific inquiry that can be proven by actual data.  *Kumho Tire*, 526 U.S. at 150 (pointing to engineering as the type of testimony that "rests upon scientific foundations").

Dr. Allen's analysis of LED Lamp Designs and LED Lamp Design Architectures has not shown to be at the appropriate level of intellectual rigor required to meet the *Daubert* standard. Importantly, the issue is not reviewed in a vacuum.  The record is replete with the business community, government regulators, and academics designing for, testing, and projecting long-term LED lamp lifetimes, and many groups spending years investigating processes and procedures subject to peer review, public comment, and government approval with respect to these issues.

United States District Court
Northern District of California

1  (*See* Vollers II Decl. ¶ 86; Dkt. No. 132-3 ("Pattinson Decl.") ¶¶ 12-14.)[16]  Young's explanation

2  that there is no relevant literature or peer review studies to cite because there is very little interest

3  in testing LED lamps and that Dr. Allen is relying on his wealth of experience and his knowledge

4  of engineering best practices is not supported.  Despite the wealth of analysis, there is a total

5  absence of a process similar to that of Dr. Allen.  Even if one could justify the expediency in

6  categorizing LED lamps by merely reviewing packaging and photos, Young has failed to show

7  that Dr. Allen's methods of broad extrapolations and temperature measurements are "generally

8  accepted in the relevant engineering community," especially where the comparative metric is self-

9  created.[17]  Nor is it probable that he can.  *Kumho Tire*, 526 U.S. at 151.

10  Dr. Allen's categorization impermissibly and overbroadly sweeps in different models and

11  versions of LED lamps for which he has done the actual testing.  Indeed, Dr. Allen's

12  categorization from 42 identified packaging, to 30 identified LED Lamps, to 7 LED Lamp

13  Designs, to 4 LED Lamp Design Architectures appears to be nothing more than a naked attempt to

14  take the findings and conclusions made from the ten (10) purchased LED lamps, which consisted

15  of only four unique (4) LED lamp types, and extend these findings and conclusion to a broad set

16  of LED lamps.  Dr. Allen nor Young have shown that this is a generally accepted practice within

17  the lighting community, especially where such tests and measurements already exist for individual

18  LED lamps.

19  Moreover, Dr. Allen's Rebuttal Report itself reveals the error of being so overinclusive.

20  Indeed, the Court is generally aware of the foundational principle that more power and wattage

21  would typically mean higher temperatures for that electrical system.  That Dr. Allen ignored this

22  in his Opening Report when making his categories reveals that Dr. Allen overlooked and failed to

---

24  [16]  As one classification example, ENERGY STAR distinguishes LED lamps through

25  wattage, whereby a manufacturer must seek new qualification if it changes the input wattage of a
qualified lamp by more than 10%.  (Vollers II Decl. ¶¶ 65-66; Pattinson Decl. ¶ 21.)

26  [17]  For instance, the studies referenced in the record show testing on individual LED lamps

27  and conclusions being drawn for that particular LED lamp.  Dr. Allen does not explain why he did
not or could not undertake a similar endeavor of individually testing each LED lamp to arrive at a

28  conclusion for each LED lamp of which the class finds at issue.

1   apply this basic understanding when creating this novel methodology.  It is unsurprising therefore

2   that Dr. Allen concedes in his Rebuttal Report that some of the lower wattage LED lamps in some

3   of the Designs and Architectures do *not* in fact fail, despite placing them within the same groups

4   as higher wattage models and versions.[18]  Dr. Allen's post hoc withdrawal does not save the initial

5   analysis.  Experience and engineering practices alone do not convert a made-up methodology into

6   one that meets the threshold requirements of admissibility.  *See Grodzitsky v. American Honda*

7   *Motor Co.,Inc.*, 957 F.3d 979, 986-87  (9th Cir. 2020) (affirming exclusion of design defect expert

8   offered in support of class certification where the expert's testimony suffered from scientific and

9   methodological flaws despite being based on "general product engineering principles").

10       Accordingly, the Court finds that exclusion of Dr. Allen's opinions as to the LED Lamp

11   Designs and LED Lamp Design Architectures is appropriately excluded under *Daubert*.[19]

### b.    Target Maximums

13       With respect to the Target Maximums, Cree challenges the analysis on two grounds.  First,

14   Cree contends that Dr. Allen's Target Maximums are an arbitrary conservative preference

15   untethered to any industry standard or accepted research.  Second, the Target Maximum analysis

16   offers no causal link between the purported defect and liability and fails to quantify any specific

17   number of failures from Cree LED lamps.  In opposition Young disputes these grounds with

18   similar arguments as in the prior section.  Namely, Young avers that Dr. Allen's opinions are

19   supported by and based on engineering best practices related to design for reliability, and that

20   there are no industry standards or regulations concerning the temperatures of the electronic

21   components of LED lamps.

22       Young does not persuade.  First, the record reflects that the Target Maximums are not a

23   commonly accepted practice within the lighting community and are merely a reflection of Dr.

----

[18]  Additionally, as Cree highlights, Dr. Allen's methodology ignores the fact that some of Cree's LED lamps have undergone some changes and updates throughout the class period.

[19]  Were this, Dr. Allen's overbroad categorization, the only flaw in Dr. Allen's opinions, the Court would have considered his results as to those LED lamps that he *actually* tested. However, as will be discussed in the next section, given the problems with his Target Maximums, Dr. Allen's opinions are appropriately stricken.

United States District Court
Northern District of California

Allen's personal design preference.  Dr. Allen must "explain precisely how he went about reaching his conclusions and point to some objective source—a learned treatise, the policy statement of a professional association, a published article in a reputable scientific journal, or the like—to show that he has followed the scientific method, as it is practiced by (at least) a minority of scientists in his field."  *Daubert II*, 43 F.3d at 1318-19; *United States v. Rincon*, 28 F.3d 921, 924 (9th Cir. 1994) (research must be described "in sufficient detail that the district court [can] determine if the research was scientifically valid.").

Here, Dr. Allen admits that there is no industry standard for maximum temperature of a heat sink, and he does not cite to any sources that recommend temperature thresholds.  (Allen Report ¶ 28.)  Dr. Allen also admits that these Target Maximums, while based on a general engineering rules of thumb, are not industry standard, but rather are a personal preference reflecting his conservative design targets.  (*Id.* ¶¶ 12, 26; Allen Dep. at 109:11-24; 111:6-112:13.)  Moreover, Dr. Allen concedes that he does not cite to one source that supports his Target Maximum analysis.  (Allen Dep. at 111:-24-112:13.)  Indeed, Dr. Allen states that he developed this methodology solely for the purpose of this litigation and that it is not peer reviewed.  (Allen Report ¶ 12; Allen Dep. at 42:11-14.)  Cree's witnesses further testified that they have never heard of Dr. Allen's target methodology, and that the industry standard methodology for LED lamp design permits LED lamp designers to rely upon the component manufacturers' specifications sheets for components' rated lifetimes.  (*See, e.g.*, Vollers I Decl. ¶¶ 17-20.)

This is not a situation where there is absence of testing or literature in the relevant field.  As previously discussed, there are accepted LED lamp lifetime projection tests, and commonly accepted processes and procedures in conducting such tests.  (*See* Vollers II Decl. ¶ 86; Pattinson Decl.  ¶¶ 12-14.)  There are ample accepted peer-reviewed and vetted industry standards for reliability testing based on long-term durational testing of a large number of LED lamps, including LM-80-08, LM-84, and ENERGY STAR program requirements whereby such qualification requires 6,000 hours of testing.  (Vollers I ¶ 27-30; Vollers II ¶¶ 79-86; Pattison ¶¶ 15-18, 25, 41,

United States District Court
Northern District of California

42, 53.)[20]  That Dr. Allen disagrees with these standards does not mean that they are irrelevant, especially where Dr. Allen's alternative methodology is not based on *any* accepted practices, and are, in fact, the opposite of these practices.  (*See* Allen Rebuttal ¶¶ 24-26, 32-34, 40, 45, 62, 68) "Something doesn't become 'scientific knowledge' just because it's uttered by a scientist; nor can an expert's self-serving assertion that his conclusions were 'derived by the scientific method' be deemed conclusive."  *In re Ford Motor Co. DPS6 Powershift Transmission Prods. Liab. Litig.*, No. ML 18-02814 AB, 2019 WL 7177984 at *1 (C.D. Cal. Dec. 2, 2019) (citing *Daubert II*, 43 F.3d at 1318).  In short, Dr. Allen's personal design preferences cannot form the basis of an admissible expert opinion given the context of the industry.  *See Daubert II*, 43 F.3d at 1319 (expert's personal opinion is not sufficient to meet *Daubert* standards); *Claar v. Burlington R. Co.*, 29 F.3d 499, 502 (9th Cir. 1994).

Second, the Target Maximum analysis offers no causal link between the purported defect and liability and fails to quantify any specific number of failures from Cree LED lamps.  Dr. Allen concludes that there is a higher risk of failure due to the heat on certain components of the LED lamp.  However, not only does Dr. Allen not define failure, he cannot quantify, or even approximate, the specific failure rate.  *See Gonzalez v. Corning*, 885 F.3d 186, 198 (3d Cir. 2018) (noting that liability determination in purported design defect class action where alleged defect is not latent in all products would require "distinguish[ing] [the products] that are likely to fail before the end of their warranty periods from [the] ones that are likely to perform as expected (*i.e.*, that are not defective)").

---

[20] These tests, in connection with the processes explained by Cree's witnesses, would not only yield results in lifetime projections, but would allow individuals to determine the cause or causes of failure.  These tests do not assume a defect, but rather seek to test the LED lamp for its performance.

By contrast, and as discussed, Dr. Allen concedes he has assumed a defect based merely on the filing of this lawsuit by Young, and then employs a methodology that assumes this premise: that there is in fact a defect in the Cree LED lamps.  Instead of seeking to determine whether a defect *exists*, Dr. Allen merely seeks to explain where the assumed defect *would* be.  In other words, Dr. Allen does not necessarily prove the existence of a defect: only that, *assuming* there is one, it is likely due in his opinion to the high temperature of the LED lamps at certain components.

United States District Court
Northern District of California

1    Nor does Dr. Allen link the defect with the ultimate liability in this action.  As Cree's

2   witnesses explain, a failure of the components identified by Dr. Allen would more often lead to a

3   parametric failure than a catastrophic failure—the latter of which is the failure that is pled in this

4   action.  (*See* ACAC ¶¶ 34, 35, 37, 41.)  Unlike a catastrophic failure, a parametric failure is highly

5   subjective, depending on the individual's sensitivity to lumen depreciation, color shift, and flicker.

6   (*See* Vollers II Decl. ¶¶ 68-71; Pattinson Decl. ¶¶ 48-50.)  Dr. Allen's opinions focus on a

7   parametric failure while overlooking the actual pled failure: catastrophic.

8    Accordingly, the Court finds that exclusion of Dr. Allen's opinions as to Target

9   Maximums is appropriately excluded under *Daubert.*

10                c.    Additional Considerations

11    Cree further moves in its reply to strike from Dr. Allen's Rebuttal his citation to new

12   methodology and studies concerning on-off switching that he asserts prove Cree LED lamps will

13   fail and statistical analysis performed on the THD records of returned Cree LED lamps.

14   Specifically, Cree highlights that these new opinions and testing do not rebut any of its expert

15   witness opinion, and that it was not properly raised in the opening report.  Additionally, Cree

16   contends that the Dr. Allen has no background or expertise in statistics, misconstrues the cited

17   studies, and reaches an incorrect conclusion with his statistical analysis.

18    The Court agrees.  As an initial hurdle, Dr. Allen's opinions incorporating these additional

19   citations and arguments were not properly raised or disclosed in his opening brief, and they do not

20   respond to any of the opinions of Cree's expert witnesses.  *See Matthew Enterprise, Inc. v.*

21   *Chrysler Group, LLC*, No. 13-cv-04236-BLF, 2016 WL 4272430 at *2 (N.D. Cal. Aug. 15, 2016

22   ("[R]ebuttal expert testimony is limited to new unforeseen facts brought out in the other side's

23   case."); *Huawei Techs., Co., Ltd. v. Samsung Elec. Co., Ltd.*, 340 F. Supp. 3d 934, 995 (N.D. Cal.

24   2018) ("The rest of whether an expert's opinion constitutes rebuttal or a new opinion . . . [is]

25   whether a rebuttal attempts to put forward new theories outside the scope of the report it claims to

26   rebut."); *Shenon v. New York Life Ins. Co.*, No. 2:18-cv-240-CAS, 2020 WL1317722, at *10 (C.D.

27   Cal. Mar. 16, 2020 (finding that attempts to "add new opinion, or deepen or strengthen existing

28   opinions" are not proper on rebuttal); *see also* Fed. R. Civ. P. 26(a)(2)(D); Fed. R. Civ. P.

37(c)(1).  Indeed, as Dr. Allen concedes, "Mr. Voller [Cree's employee] did not address on-off switching, nor testing in luminaries that represent consumer applications."  (Allen Rebuttal ¶ 45.) For this plain reason, they are inappropriate and should indeed be stricken.[21]

Finally, while Dr. Allen might be expert in statistical analysis, the record does not support the conclusion.  Under Federal Rule of Evidence 702,"[t]he burden is on the proponent of the expert testimony to show, by a preponderance of the evidence," that the expert is qualified and meets the necessary admissibility requirements.  *Contour IP Holding LLC v. GoPro Inc.*, 2021 WL 75666, at *10 (N.D. Cal. Jan. 8, 2021) (citing *Lust By & Through Lust v. Merrell Dow Pharm., Inc.*, 89 F.3d 594, 598 (9th Cir. 1996)).  An expert's qualifications in one discipline do not make him qualified in a separate field.  In short, Young has not shown that Dr. Allen is qualified to perform that type of statistical analysis on the THD materials that he has done.  On this basis too is Dr. Allen's new opinions made in his rebuttal also appropriately stricken.

d.   <u>Conclusion</u>

In sum, for the foregoing reasons, the Court concludes that Dr. Allen's opinions do not meet the *Daubert* standard.  Accordingly, the Court **GRANTS** the *Daubert* motion as to Dr. Allen.[22]

**B.   Motion for Class Certification**

Young moves to certify a California class of consumers who have purchased specific Cree LED bulbs.  In opposition, Cree challenges the commonality, typicality, and adequacy factors of

---

[21]  Indeed, even considering the cited California Public Utilities Commission ("CPUC") study, it is not facially apparent whether Make #5, a model with some issues, is a Cree LED lamp where the study anonymized the subject lamps.  As Cree's employee, Vollers, declared, he could not definitively conclude that Cree is the manufacturer of Make #5 as some of the specifications do not match up with attributes of its consumer products.  (Vollers II Decl. ¶¶ 34-37.)  Dr. Allen was not involved in this CPUC study and Dr. Allen does not otherwise explain why he arrived at his conclusion that Make # 5 is a Cree lamp.  Instead, Dr. Allen has made an unfounded assumption without explanation.  *See Diviero v. Uniroyal Goodrich Tire Co.*, 114 F.3d 851, 853 (9th Cir. 1997) ("Rule 702 demands that expert testimony relate to scientific, technical, or other specialized knowledge, which does not include unsubstantiated speculation and subjective beliefs.").  Furthermore, neither new cited study reflects on-off cycles that are common or typical in the field.  (*See* Vollers II Decl. ¶¶ 40, 44, 51.)

[22]  As the Court discusses below, without Dr. Allen's expert testimony, Young cannot satisfy the necessary elements for class certification, even without consideration of Cree's *Daubert* motion as to Dr. Boedeker.  Accordingly, the Court **DENIES AS MOOT** the *Daubert* motion as to Dr. Boedeker.

United States District Court
Northern District of California

United States District Court
Northern District of California

1  Rule 23(a), in addition to the requirements under Rule 23 (b)(3).  The Court begins by addressing

2  the commonality factor.[23]  Thus:

3         Under Federal Rule of Civil Procedure 23(a), a court may certify a class only where "(1)

4  the class is so numerous that joinder of all members is impracticable; (2) there are questions of law

5  or fact common to the class; (3) the claims or defenses of the representative parties are typical of

6  the claims or defenses of the class; and (4) the representative parties will fairly and adequately

7  protect the interests of the class."  Fed. R. Civ. P. 23(a).  Young must demonstrate that these four

8  requirements are met by a preponderance of the evidence.  Here, Young fails to establish that there

9  are common questions of law or fact.

10        The commonality requirement is satisfied where the claims of all members of the proposed

11  class "depend upon a common contention . . . of such a nature that it is capable of classwide

12  resolution—which means that determination of its truth or falsity will resolve an issue that is

13  central to the validity of each one of the claims in one stroke."  *Dukes*, 564 U.S. at 350.  Courts

14  generally construe the commonality requirement "permissively" and find that "[a]ll questions of

15  fact and law need not be common to satisfy the rule."  *Ellis*, 657 F.3d at 981 (alteration in original)

16  (internal quotations omitted); *see also Rodriguez v. Hayes*, 591 F.3d 1105, 1122 (9th Cir. 2010)

17  ("common" does not mean "complete congruence").  However, in a case alleging claims of a

18  defective product and misrepresentations regarding that defect, "[w]ithout any evidence of a

19  common defect, there are no 'common questions of law or fact' binding the proposed class

20  together."  *Kramer v. Toyota Motor Co.*, 688 F. App'x 765, 766 (9th Cir. 2016).

21        Here, the Court's ruling on the *Daubert* motion as to Dr. Allen are fatal to a finding of

22  commonality under the proposed class.  Young's common issues are premised on a purported

23

24        [23]  Cree does not challenge the numerosity requirement under Rule 23(a).  Nor could Cree,

25  based on the record before the Court, as it is clear that there are a sufficient number of consumers
   of Cree LED bulbs based on the numerosity requirement.  *See, e.g., Akaosugi v. Benihana Nat.*

26  *Corp.*, 282 F.R.D. 241, 253-54 (N.D. Cal. 2012) ("[C]ourts generally find the numerosity
   requirement satisfied when a class includes at least forty members."); *Hernandez v. Cnty. of*

27  *Monterey*, 305 F.R.D. 132, 153 (N.D. Cal. 2015) ("A class or subclass with more than 40
   members raises a presumption of impracticability based on numbers alone." (internal quotation

28  marks omitted)).

United States District Court
Northern District of California

misrepresentation about the longevity of Cree LED bulbs.  Young cites a number of omission cases where consumers sued manufactures of a product with an undisclosed, fundamental, and identified design defect.  *See, e.g.*, *Wolin v. Jaguar Land Rover N. Am. LLC*, 617 F.3d 1168, 1172 (9th Cir. 2010).  Young relies exclusively on Dr. Allen's opinions purporting to establish common evidence of a defect relating to overheating in Cree LED lamps.[24]  Without this evidence, Young does not articulate an alternative method of proving why or how his own bulbs failed, much less one across multiple product lines and generations.  Without such evidence, Young does not show commonality in support of class certification.  *See Kramer*, 688 F. App'x at 766; *see also Gonzalez*, 885 F.3d at 196-199 (holding that where "[d]effective design [was] an essential element of [p]laintiffs' misrepresentation-based claims" and plaintiffs "do not identify a particular defect" and therefore "invite [the court] to equate the existence of a defect with the mere possibility that one might exist" there "no support in Rule 23 or caselaw for certification on such a speculative basis"); *Grodzitsky v. American Honda Motor Co., Inc.*, No. 12-cv-001142-SVW-PLA, 2017 WL 8943159, at *6 (N.D. Cal. Oct. 30, 2017) ("All they have is a series of [products] that may or may not have broken before they were supposed to, and these breakages may or may not have been caused by a common defect which may or may not exist.  This is manifestly inadequate to satisfy Rule 23.").

Instead, the issue of falsity or Cree's alleged misrepresentations turn on issues that are not common to the class as a whole: whether each consumer's bulb failed, the manner of the failure, the extent of longevity before failure, and what ultimately caused the failure.  *See Kramer*, 668 F. App'x at 766 ("Without any evidence of a common defect, there are no 'common question of law or fact' binding the proposed class together."); *Gonzalez*, 885 F.3d at 198 ("If proponents of the

---

[24]  As discussed under the *Daubert* analysis, it is not even clear that Dr. Allen's report establishes that there is, in fact, a defect within the identified Cree LED lamps at issue.  Dr. Allen testified that he essentially was provided an "inference" that these lamps were defective based on the filing of this lawsuit by Young.  (Allen Dep. at 83:19-84:24.)  Dr. Allen posits reasons for this defect, assuming it is exists, but fails to grapple with evidence in the record that shows that since 2013, Cree has not had any excessive premature failure, especially within less than one year of operation.  (Vollers I Decl. ¶ 56.)  In other words, Dr. Allen's report provides, at best, the likeliest source of a defect, but does not establish that there is *actually* a defect and that the defect has any link to the misrepresentations at issue.

class do not allege a defect common the class, the defectiveness of a given product is, by necessity, not susceptible to proof by classwide evidence.").  This is manifestly an individual determination, and therefore inappropriate to satisfy the commonality requirement under the Rule 23 analysis.[25]

Accordingly, the Court **DENIES** the motion for class certification.

## IV.    CONCLUSION

Accordingly, the for the foregoing reasons, the Court **HEREBY ORDERS** as follows:

- Cree's *Daubert* motion as to Dr. Allen is **GRANTED**;
- Young's motion for class certification is **DENIED**; and
- Cree's *Daubert* motion as to Dr. Boedeker is **DENIED AS MOOT**.

Moreover, in light of this Order, the Court hereby **SETS** a compliance deadline for **9:01 a.m.** on **Friday, February 26, 2021**.  **Five (5) business days** prior to the date of the compliance deadline, the parties shall file a **JOINT STATEMENT** setting forth the parties' position with respect to the scheduling of this case.  If compliance is complete, the compliance deadline will be taken off calendar.

This Order terminates Docket Numbers 115, 116, 117, 118, and 127.

**IT IS SO ORDERED.**

Dated: January 28, 2021

**YVONNE GONZALEZ ROGERS**
**UNITED STATES DISTRICT JUDGE**

---

[25]  The Court declines to alternatively consider the remaining Rule 23(a) and 23(b)(3) factors in light of the court's conclusion as to commonality.

United States District Court
Northern District of California